# STATE OF MICHIGAN

# COURT OF APPEALS

<table>
<tr>
<td>

PHILIP F. CONLIN, JERRY L. HELMER,
RUTHANN HELMER, JOHN D.
MCCULLOUGH, and DAVID G. HELMER,

Plaintiffs-Appellants,

</td>
<td>

FOR PUBLICATION
November 24, 2015
9:00 a.m.

</td>
</tr>
<tr>
<td>

v

TOM UPTON, TIM HALLER, CHRIS CONLIN,
BARBARA HALLER, DAVID BAKER, and
DIXBORO FARMS PROPERTY OWNERS
ASSOCIATION,

Defendants-Appellees.

</td>
<td>

No. 322458
Washtenaw Circuit Court
LC No. 12-000942-CH

</td>
</tr>
</table>

Before: M. J. KELLY, P.J., and MURRAY and SHAPIRO, JJ.

PER CURIAM.

In this real property dispute, plaintiffs, Philip F. Conlin, Jerry L. Helmer, Ruthann Helmer, John D. McCullough, and David G. Helmer (collectively, the Developers), appeal by leave granted the trial court's final judgment and order, which the trial court entered after the jury returned a verdict in favor of defendants, Dixboro Farms Property Owners Association (the Association), and the Association's officers and directors, Tom Upton, Tim Haller, Chris Conlin, Barbara Haller, and David Baker (collectively, the Officers). The Developers and the Officers each own or owned real property in a residential development known as Dixboro Farms. Dixboro Farms had 34 total lots. During the events at issue, the Developers owned eleven undeveloped lots, which they hoped to sell to third parties. The present dispute arose after the Association adopted bylaws that required the lot owners to submit plans to the Association's architectural review committee for approval prior to any new construction or renovation. The Developers sued, in part, to prevent the Officers and the Association from enforcing the bylaws in a way that restricts their right to develop their lots. For the reasons more fully explained below, we reverse the jury's verdict, vacate the judgment, and remand for further proceedings.

## I. BASIC FACTS

Philip Conlin testified that he and others purchased "just over ninety" acres of land in 1998 or 1999 and split the land into lots for development as Dixboro Farms. The land gently slopes down from north to south. The north end of the property has nicer features—it is hilly,

wooded, and has a seasonal creek. The south end, however, abuts an easement with 200-foot-high towers for power lines. Accordingly, the northern lots were more expensive than those on the south end of the development.

Philip Conlin stated that he and his co-developers established a set of restrictions and protective covenants for the development and recorded them in January 2001. The restrictions and covenants served as a "roadmap to any prospective purchaser" and helped define the "future use" of the land. He placed a restriction in the covenants that required a prospective purchaser to obtain his permission—in his role as the developer—before building on any parcel. He requires the purchaser to provide him with plans, and has the right to determine whether the proposed home is harmonious with the development as a whole. Philip Conlin rejected more proposals with this development than he had rejected in any of his previous developments; he was surprised by the number of people who wanted to buy a $200,000 lot and then build a $100,000 home. "I mean, I had more people that were just so off base with what they thought I would allow there but still knew the high quality of the development and thought that paying for the land would raise up their value of the inferior structure that I wouldn't allow to be built."

The covenants included a provision for the formation of a property owners association, which Philip Conlin incorporated in 2007. The covenants provided that Philip Conlin would appoint the board of directors for the association after the sale and development of 50% of the lots. The members had the right to elect the board of directors after sale of 90% of the lots.

William Farley testified at his deposition, which was read into the record at trial, that he was one of the first purchasers in Dixboro Farms. As one of the first to build, he felt he was setting "the standard for the development" and was "very concerned" about building a house that might not be "compatible with what was going to be built in the remaining lots." He did not want to build a high-end home only to have "mid-level tract homes" follow. The lots were priced at the high-end—around $150,000 to $200,000—which suggested to him that the whole development would be high-end. Farley spoke with Philip Conlin about his concerns. He submitted plans to Philip Conlin for a home that was from 3400 to 3800 square feet in size, had a four-stall garage, and was four-sided brick. Philip Conlin told him that the plans reflected " 'precisely what we want the Dixboro Farms subdivision to be.' "

Philip Conlin confirmed on cross-examination that there were no new homes built in Dixboro Farms from 2006 through 2009 because the real estate market had taken a turn for the worse. However, he approved two new homes—referred to as the Guenther homes—for construction in 2010. After the completion of the homes later that year, Philip Conlin learned that many of the existing homeowners were upset about the new homes. They were dissatisfied with the homes and felt that they were not in harmony with the quality of the existing homes.

There was, according to Farley, "a lot of discussion among the neighbors" about the new homes; they had invested several hundred thousand dollars in their own homes and were worried that if the remaining lots were built with similar housing to the Guenther homes, it would dramatically alter the character of Dixboro Farms. Timothy Haller, who also owns a home in Dixboro Farms, explained that there was "a groundswell of dissatisfaction that these homes had been erected . . . ." Farley said the neighbors all thought the new homes were not in harmony with the previous eleven homes: they "were typical low-end, middle, medium-type tract homes,

no brick and mortar, no architectural definition, lots of shingles, exposed roof lines, vinyl-sided." Farley felt that Philip Conlin had backed away from his earlier representation about the character of Dixboro Farms when he approved those homes. Haller similarly testified that the Guenther homes were "not even close" to the homes that were built over the "prior ten years." Because the neighbors now had "trust issues" with Philip Conlin, Farley stated that they met to consider how they might exercise some influence over future development.

In December 2010, Chris Conlin, who is Philip Conlin's cousin and a homeowner in Dixboro Farms, sent an email to Philip Conlin requesting that he appoint the board of directors for the Association and call a meeting of the homeowners. Chris Conlin wrote that it was "understood" that the new board would form an architectural committee at this first meeting and that the residents would "move to amend" the covenants to include " 'preferred three sides brick' in the language." Philip Conlin appointed the Association's first board of directors later that month.

The homeowners met in January 2011. All the homeowners in attendance at the meeting signed a letter with a summary of their position, which was sent to Philip Conlin. In the letter, which is misdated January 2010, they expressed their gratitude to Philip Conlin for establishing and developing Dixboro Farms. They noted that they had reached a consensus on "a number of issues" and were sending him the letter to "inform" him about their decisions and seek his "concurrence in the progress and basis of continuing cooperation." They wanted to elect their own board for the Association and they expected him to "concur" with this decision. The homeowners also "acted to appoint" an architectural control committee to "cooperate and assist in maintaining architectural harmony in the subdivision." They wrote that the committee's duties would be defined in cooperation with him. Finally, the homeowners stated that they intended to develop bylaws for the Association. The homeowners closed the letter with a request that he sign the letter to indicate his "acceptance and acknowledgement" of the newly formed Association.

Philip Conlin signed the letter and dated it January 14, 2011. He conceded at trial that he had signed the letter and acquiesced to the homeowners' decision to elect their own board of directors for the Association, notwithstanding his continued right to appoint the board.

Haller testified that the Association hired a lawyer, Walter Hamilton, to advise it on the adoption of bylaws. In June 2011, Haller hosted a meeting of the property owners to consider a proposed set of bylaws. Haller stated that the debate centered on the "purpose of the bylaws and protecting our property values moving forward . . . ." Philip Conlin and Jerry Helmer attended the meeting and actively opposed the adoption of the bylaws, but a majority approved them.

The Association's bylaws established an architectural review committee and, in relevant part, prohibited the Association's members from commencing, erecting, or maintaining on "any Lot" a "building, fence, wall, deck, swimming pool, out-building or other structure, original landscaping on new construction or exterior improvement" without first obtaining the committee's approval. Under section 3 of that same article, a lot owner had to submit a $2,000 fee with a set of required plans. Although the committee had the authority to deny a plan that violated the original covenants or restrictions, it could also deny the plan on the basis of "dissatisfaction with the effect of the proposed construction on the harmonious development" of

Dixboro Farms. The bylaws included guidelines that the committee was to enforce "to insure that all construction in the subdivision is in harmony with the character of the subdivision" as it develops. The Association's lawyer recorded the bylaws in December 2011.

In December 2011, Philip Conlin submitted a proposed plan of development for a lot to the Association. In his cover letter, he stated that he was submitting the plans as part of the review that he was required to perform as the developer, but he invited the Association's comments and suggestions on the plan.

Haller responded to the letter by email. He related that the committee had met about the proposed plan and offered some "preliminary feedback." The committee, he wrote, felt that the proposed home should have a 100-foot setback rather than a 60-foot setback and should be 100% stone or brick or a combination, but in any event "must" be brick or stone on the first floor. The committee also reminded him that his client would have to submit plans along with $2,000 for a comprehensive review, as required under the bylaws.

In August 2011, the Developers sued the Association's Officers. They alleged that the Officers caused the Association's bylaws to be recorded and that the bylaws contained invalid restrictions on the development of lots within Dixboro Farms. The recording of these restrictions, the Developers further stated, made it more difficult to sell their remaining lots. In their first count, the Developers asked the trial court to declare that the additional restrictions did not bind, and were not applicable to, the Developers' lots. They also alleged that the recording of the bylaws amounted to slander of title in a second count. In December 2012, the trial court entered an order allowing the Developers to amend their complaint to include the Association.

In April 2013, the Developers moved for partial summary disposition under MCR 2.116(C)(10). They maintained that the undisputed evidence showed that Philip Conlin did not assign to the Association his right to approve proposed plans for the development of lots. Because he did not assign that right, and it was undisputed that the original covenants and restrictions did not give the Association the right to add new restrictions, the Association could not—under the guise of enforcing the harmony of the development—establish new restrictions through the adoption of bylaws. The Developers argued that they were entitled to a declaration that the new restrictions contained in the Association's bylaws did not apply to their lots.

The trial court held a hearing on the motion in June 2013. After hearing arguments, the trial court determined that there was a question of fact as to whether Philip Conlin assigned to the Association his right to review any proposed plans for development. For that reason, it denied the Developers' motion.

In October 2013, the Association moved for partial summary disposition. It argued that the Developers' slander of title claim was untimely and must be dismissed. The Officers also each individually moved for summary disposition of the Developers' claims against them on the grounds that the Developers did not validly state claims against them as individuals and did not plead in avoidance of their immunity. The trial court entered orders dismissing the Developers' slander of title claim and their claims against the individual Officers.

The case proceeded to trial in March 2014. After the close of proofs, the Developers moved for a directed verdict. They argued that the undisputed evidence showed that the bylaws burdened their properties with new or expanded restrictions, which were not permitted by the original covenants. They further argued that the evidence did not establish that Philip Conlin assigned to the Association his authority to approve proposed plans for development or that the Developers were estopped from challenging the new restrictions in the bylaws. The trial court determined that it was for the jury to decide whether the bylaws imposed restrictions beyond those permitted by the original covenants and whether Philip Conlin assigned to the Association his right to preapprove. Consequently, it denied the motion.

The parties submitted a special verdict form to the jury. They asked the jury to answer whether the bylaws constituted "restrictive covenants" that ran with the land and whether the bylaws impaired the Developers' rights by violating the 2001 covenants and restrictions. The jury answered "No" to both questions. Because they were told to skip the next two questions if they answered 'no' to the first two questions, the jury did not find whether Philip Conlin assigned to the Association his right to determine whether new developments were harmonious.

In April 2014, the trial court entered a judgment of no cause of action against the Developers and ordered them to pay more than $58,000 in attorney fees to the Association.

The Developers now appeal in this Court.

## II. DIRECTED VERDICT

## A. STANDARD OF REVIEW

The Developers argue on appeal that the Association adopted bylaws that plainly imposed new building and use restrictions on the real property in Dixboro Farms. Because the covenants did not—as a matter of law—give the lot owners or the Association the authority to adopt new restrictions with less than majority consent, the new restrictions had to have been adopted by unanimous consent of the lot owners, which it is undisputed did not occur. Consequently, the Developers state, the trial court erred when it determined that there was a question of fact for the jury as to the proper construction of the covenants and bylaws; instead, the trial court should have granted them judgment as a matter of law, directed verdict in their favor, or granted them judgment notwithstanding the verdict.

This Court reviews de novo a trial court's decision on a motion for a directed verdict. *Taylor v Kent Radiology, PC*, 286 Mich App 490, 499; 780 NW2d 900 (2009). This Court also reviews de novo the proper construction of restrictive covenants involving real property. *Johnson Family Limited Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 389; 761 NW2d 353 (2008). The proper construction of a contractual agreement is likewise a question of law that this Court reviews de novo. *Miller-Davis Co v Ahrens Construction, Inc*, 495 Mich 161, 172; 848 NW2d 95 (2014). Finally, this Court reviews de novo whether the trial court properly applied this state's common law. *Roberts v Salmi*, 308 Mich App 605, 612; 866 NW2d 460 (2014).

## B. ANALYSIS

In this case, there is no dispute that the deed restrictions and protective covenants for Dixboro Farms, which were recorded in January 2001, are valid and enforceable against the lots in Dixboro Farms. The dispute concerns whether the Association's bylaws include additional restrictions on the use and development of the lots within Dixboro Farms and, if so, whether the Association can validly enforce those restrictions against the lots owned by the Developers even though the Developers did not consent to the adoption of the bylaws.

### 1. ARTICLE XII UNAMBIGUOUSLY IMPOSES RESTRICTIONS ON THE LOTS

Operating agreements, such as a corporation's bylaws, are intended to govern the future conduct of the entity and its members. *People ex rel Pulford v Fire Dep't of City of Detroit*, 31 Mich 458, 465 (1875). Generally, an entity's bylaws or membership agreement may provide for the regulation and management of its affairs so long as the provision is not inconsistent with law or the articles authorizing the entity. See MCL 450.1231; MCL 450.4210. When validly promulgated, an entity's bylaws or similar governing instrument will constitute a binding contractual agreement between the entity and its members. See *Mayo v Great Lakes Greyhound Lines*, 333 Mich 205, 214; 52 NW2d 665 (1952) (providing that the members of a voluntary association are bound by the association's constitution and general laws); *Kauffman v The Chicago Corp*, 187 Mich App 284, 287; 466 NW2d 726 (1991) (stating that the constitutions, rules, and bylaws of the entities at issue "constitute a contract by all members" of the entities "with each other and with the [entity] itself"); *Allied Supermarkets, Inc v Grocer's Dairy Co*, 45 Mich App 310, 315; 206 NW2d 490 (1973) ("The bylaws of a corporation, so long as adopted in conformity with state law, constitute a binding contract between the corporation and its shareholders."). In this case, the parties do not dispute that the Association had the authority to adopt bylaws and that the bylaws were adopted by a majority of the Association's members. Thus, to the extent that they do not conflict with the Association's articles of incorporation or this state's law, the bylaws would constitute a binding contractual agreement between the Association and its various members.

The Association's members have a common law right to try and enhance the value of their property through contractual agreements concerning the use and development of their real property. It is "well-grounded" in Michigan's common law "that property owners are free to attempt to enhance the value of their property in any lawful way, by physical improvement, psychological inducement, contract, or otherwise." *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002) (quotation marks, emphasis, and citation omitted). "A covenant is a contract created with the intention of enhancing the value of property, and, as such, it is a 'valuable property right.'" *Id.*, quoting *City of Livonia v Dep't of Social Services*, 423 Mich 466, 525; 378 NW2d 402 (1985). However, although Michigan courts recognize that restrictions are a valuable property right, this right must be balanced against the equally well-settled principle that courts will not lightly restrict the free use of property. See *O'Connor v Resort Custom Builders, Inc*, 459 Mich 335, 341; 591 NW2d 216 (1999) (characterizing the protection of the free use of property as a fundamental principle). Courts sitting in equity "do not aid one man to restrict another in the use to which he may put his property unless the right to such aid is clear." *Eveleth v Best*, 322 Mich 637, 642; 34 NW2d 504 (1948) (quotation marks and citation omitted). Similarly, the provisions of a covenant "are to be strictly construed against the would-be enforcer

. . . and doubts resolved in favor of the free use of property." *Stuart v Chawney*, 454 Mich 200, 210; 560 NW2d 336 (1997). When construing a restrictive covenant, courts may only give it a fair construction; courts may not broaden or limit the restriction. *Kelly v Carpenter*, 245 Mich 406, 409; 222 NW 714 (1929). To that end, courts will not infer the existence of a restriction—the restriction must be expressly provided in the controlling documents. *O'Connor*, 459 Mich at 341, citing *Margolis v Wilson Oil Corp*, 342 Mich 600, 603; 70 NW2d 811 (1955) ("The restrictions contain no express prohibition against a side entrance to defendant's lots from Robson avenue. None will be implied."). Courts will not enlarge or extend a restriction through interpretation, even to accomplish what it may be thought the parties would have desired had a situation that later developed been foreseen by them at the time the restriction was written. *Sampson v Kaufman*, 345 Mich 48, 53; 75 NW2d 64 (1956).

The Association's members were not required to establish their covenants and restrictions through any particular type of instrument. See *Erichsen v Tapert*, 172 Mich 457, 463; 138 NW 330 (1912) ("The fact that the restriction is created in an instrument independent of the deed conveying title is of no consequence, as long as there is a valuable consideration moving to and from the signers."). Accordingly, they could adopt covenants concerning their real property through the adoption of bylaws, which would then be contractually binding on the members to the same extent that any other properly adopted covenant would be binding.

The Association's bylaws contain numerous provisions governing the Association's affairs that are not in dispute. The parties do not dispute the provisions establishing the Association's membership, governing meetings and voting, stating the qualifications and duties of officers and directors, or regulating finance and assessments. The dispute, rather, centers on Article XII of the bylaws, which establishes an architectural review committee.

The first section of that article prohibits the members from commencing, erecting, or maintaining any "building, fence, wall, deck, swimming pool, out-building or other structure, original landscaping on new construction or exterior improvement" or making an addition, change, or alteration to such an improvement without first submitting plans for the improvement to the committee and obtaining its approval. A member who submits his or her plans to the committee must pay $2,000 for the review and must deposit $5,000 to cover possible damages from the development. The committee has broad authority to deny a proposed plan: it may disapprove the plan because it does not comply with the restrictions and covenants for the development, but it also may disapprove the proposed improvement because it is dissatisfied "with the effect of the proposed construction on the harmonious development" of Dixboro Farms. The latter ground for disapproval may be founded on the proposed "location of the structure . . ., the materials used, the color scheme, the finish, design, proportion, shape, height, style or appropriateness of the proposed improvement or alteration or because of any matter or thing which . . . would render the proposed improvement or alteration inharmonious . . . ."

The bylaws also provide rules—labelled guidelines—that regulate the committee's ability to exercise its discretion to approve proposed plans. The guidelines, for example, provide that no building or structure can exceed 35 feet in height and that all first floor walls must be "stone or brick, or a combination of both." The guidelines also specifically prohibit the use of plywood siding, aluminum siding, or vinyl siding on any home. Although the bylaws refer to these

requirements as guidelines, it is evident that the committee has a responsibility to reject as unharmonious a proposed development or alteration that does not meet these criteria.

Article XII is not reasonably susceptible to more than one construction and clearly imposes limits on the members' ability to develop and use their lots through the committee's review process—that is, the bylaws unambiguously establish rules governing the use and development of the land within Dixboro Farms. *Farm Bureau Mut Ins Co Mich v Nikkel*, 460 Mich 558, 566; 596 NW2d 915 (1999). Accordingly, we must determine whether the Association had the authority to regulate its members' use and development of their lots and, if the Association had that authority, whether it exceeded its scope.

## 2. THE ORIGINAL PROPERTY OWNERS DID NOT GIVE THE ASSOCIATION THE AUTHORITY TO REGULATE THE PROPERTIES THROUGH BYLAWS

The Association's articles of incorporation provide that the Association was formed to "manage and administer the affairs and to maintain Dixboro Farms . . . ." It was also formed to "levy and collect assessments against and from the members," "to make reasonable rules and regulations governing the use and enjoyment" of the subdivision, and to "enforce the provisions" of the covenants, restrictions, articles of incorporation, bylaws, and rules and regulations that may be adopted. These provisions are also not ambiguous and give the Association broad authority to promulgate bylaws regulating the members' conduct within the Association itself and also as property owners in Dixboro Farms. Consequently, if the bylaws do not conflict with this State's law, they must—as with any other type of contract—be enforced as written. *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005).

Under Michigan's common law, a property owner normally cannot be contractually bound by a covenant regulating the use of his or her real property without his or her agreement to the covenant. Thus, a group of property owners cannot impose building and use restrictions on a neighboring property owner without his or her consent. See *Eveleth*, 322 Mich at 641-642 (holding that the restrictions did not apply to the lot at issue because the restrictions were not imposed by a common owner and were not agreed to by the current lot owners or by their grantors in the chain of title); *Hart v Kuhlman*, 298 Mich 265, 267; 298 NW 527 (1941) ("The right of defendant cannot be made to rest upon a mere neighborhood plan to which he was not a consenting party."); *Doxtator-Nash Civic Ass'n v Cherry Hill Professional Bldg, Inc*, 12 Mich App 468, 472; 163 NW2d 262 (1968) ("The fact that other lot owners in the subdivision who were strangers to the title to defendants' property may have agreed on a plan of restrictions governing their property could not result in restrictions binding upon defendants or their predecessors in title."). However, a party may be bound by a covenant to which he or she did not personally agree, if that party's predecessor in interest established the restrictive covenant and the covenant appears in the owner's record title. See *Sanborn v McLean*, 233 Mich 227, 230; 206 NW 496 (1925).

A covenant affecting the use of real property may be personal or may run with the land, as determined by the parties' intent. See *Greenspan v Rehberg*, 56 Mich App 310, 320-321; 224 NW2d 67 (1974), citing, among other authorities, *Mueller v Bankers Trust Co*, 262 Mich 53, 56; 247 NW 103 (1933). A covenant affecting the use of real property runs with the land if, in relevant part, the parties express their intent to bind their successors and assigns. *Greenspan*, 56

Mich App at 320-321. If the covenants are structured to run with the land, a subsequent purchaser will be bound by the covenants if he or she purchases the land with actual or constructive notice of the covenants. *Phillip v Naff*, 332 Mich 389, 393; 52 NW2d 158 (1952). A subsequent purchaser is on constructive notice that his or her use of the property will be subject to the covenants when the covenants appear in the purchaser's chain of title. *Sanborn*, 233 Mich at 231.

There is no language within the bylaws to suggest that the members intended the provisions dealing with the architectural committee to constitute a new set of covenants that would run with the land. In any event, the record evidence shows that the Developers did not agree to the adoption of the bylaws with the property restrictions contained under Article XII; as such, even if the drafter of the bylaws intended to establish new covenants or restrictions with the adoption of the bylaws, those covenants and restrictions would not be binding on the Developers or their successors or assigns. *Eveleth*, 322 Mich at 641-642. Moreover, Philip Conlin filed the Association's articles of incorporation in June 2007, which was after the first lots within Dixboro Farms had been sold. Because some lots had already been sold to third-parties subject only to the covenants recorded in 2001, Philip Conlin could not use his role as the developer to impose new covenants or alter the existing covenants unilaterally by incorporating the Association and purporting to give it the power to establish new covenants or alter the existing covenants for the subdivision with less than unanimous approval. See *McQuade v Wilcox*, 215 Mich 302, 305-306; 183 NW 771 (1921) (stating that the original owner could not unilaterally alter the restrictive covenants applicable to the lots at issue because others purchased the lots in reliance on the restrictions). If the Association had the authority to alter the existing covenants or adopt new covenants with less than unanimous consent, its authority must derive from the covenants and restrictions recorded in 2001.

### 3. THE COVENANTS DID NOT AUTHORIZE THE IMPOSITION OF NEW OR EXPANDED RESTRICTIONS WITH LESS THAN UNANIMOUS CONSENT

The parties to covenants that run with the land may agree that they or their successors or assigns can amend the covenants with less than unanimous agreement. See *Ardmore Park Subdivision Ass'n, Inc v Simon*, 117 Mich App 57, 62; 323 NW2d 591 (1982). If the owners subsequently alter the covenants in compliance with the terms of the original covenants, the change will bind the owners of all the properties subject to the original covenants, even those owners who opposed the change. *Id.* Therefore, if the owners of the lots in Dixboro Farms or their predecessors in interest gave the Association the power to amend or establish restrictions on the use and development of the lots within Dixboro Farms with less than unanimous approval, and the bylaws were adopted in compliance with that grant of power, the restrictions contained in the bylaws would be valid and enforceable against the Developers and their successors even though they differ in nature and extent from those contained in the original covenants and even though the Developers did not agree to the adoption of the bylaws.

The original owners of Dixboro Farms recorded a series of deed restrictions and protective covenants in January 2001. Paragraph one of the covenants, for example, placed limits on the use of the lots and on the types of buildings that could be constructed on the lots; paragraph two required the lot owners to maintain easements for utilities; paragraph three required all utilities to be below ground; paragraph six subjected the lots to an annual

maintenance charge; paragraph ten imposed additional requirements and limitations on the development of lots, and paragraph 14 limited the use of signs and billboards. The covenants also included paragraph five, which established the Association.

In paragraph five, the original landowners gave the Association the power to sue: "The Association shall have the right and power in its own name to take and prosecute all suits, legal, equitable or otherwise which may be, in the opinion of the Association, necessary or advisable for any purpose deemed for the benefit of the Association members." The original landowners also expressly granted the Association certain other powers at various points in the covenants: under paragraph six, it has the power to adjust the amount of the annual maintenance fee, including the power to raise the fee beyond the maximum with the approval of a majority of the members; it has the power to spend the maintenance fund on various things under paragraphs six and eight; it has the power to enforce a provision requiring property owners to repair damage that the owner might have caused to certain common areas under paragraph ten; paragraph 26 granted the Association the power to hire contractors to perform maintenance on neglected property and charge the owner; and, it has the power to abate violations of the restrictions and covenants with notice to the property owner and charge the expense to the owner under paragraph 29. Conspicuously absent from these provisions is any reference to the Association's power to amend the covenants, or to establish new restrictions or covenants. Indeed, the only reference to such a power in the covenants is in paragraph 30, which expressly provides that two-thirds of the *owners* of the lots have the power to *release* certain "restrictions, conditions, covenants, charges and agreements" and then only after the passage of 15 years.

By reserving the power to amend the covenants by less than unanimous consent to the owners, and then limiting that power in extent (release of certain specified restrictions) and time (after 15 years), the original landowners plainly expressed their intent that the covenants and restrictions could not be altered by the Association acting on its own initiative, could not be altered until 15 years after the recording of the covenants in January 2001, and could only be altered to "release" certain specified restrictions. The covenants are unambiguous and did not expressly provide the Association with the authority to alter the original covenants and restrictions on its own initiative and did not authorize the owners to add new restrictions or increase the burden of existing restrictions with less than unanimous consent. Accordingly, this Court must enforce the covenants as written. *Rory*, 473 Mich at 468. We conclude that the bylaws violate this state's common law requirement that covenants and restrictions be unanimously approved by all the affected property owners to the extent that the bylaws impose burdens on the individual members' real property beyond those expressly provided in the covenants recorded in 2001.

4. ARTICLE XII IMPOSES NEW OR EXPANDED BURDENS ON THE LOTS

The original covenants granted certain powers to the Association. Because the Association's articles authorize it to "to make reasonable rules and regulations governing the use and enjoyment" of the subdivision, and to "enforce the provisions" of the covenants and restrictions, the Association could validly promulgate rules governing the manner of its exercise of the powers expressly granted to it. And, as long as the rules did not impose additional burdens on the members' properties, the adoption of the rules by less than all members would not violate this State's common law unanimity requirement.

The covenants expressly granted the Association the authority to abate violations "of any condition or restriction or breach of any covenant" in paragraph 29. Because homeowners associations generally have standing to enforce restrictions on behalf of their members, *Civic Association of Hammond Lake v Hammond Lake Estates No 3 Lots 126-135*, 271 Mich App 130, 135; 721 NW2d 801 (2006), and the covenants expressly gave the Association the authority to abate violations, the Association could promulgate rules interpreting the covenants and restrictions and setting the procedures governing its own enforcement of those covenants and restrictions. For instance, paragraph 20 of the covenants and restrictions provides that the lot owners may keep "common household pets" unless "they become an annoyance or nuisance to the neighborhood." The restriction does not define common household pet and does not define the conditions under which a common household pet will be deemed to be a nuisance. The Association could for that reason promulgate rules expressing its understanding of those terms and governing its procedure for enforcing that particular restriction. The Association could not, however, expand that restriction or impose a new burden on the lot owners with less than unanimous consent under the guise of interpreting the restriction. See *Golf View Improvement Assoc v Uznis*, 342 Mich 128, 130-131; 68 NW2d 785 (1955) ("We do not accept this round-about interpretation of the restrictions to fix a minimum area when it could have been expressed directly in so many words. We conclude that it would have been so expressed had it been the intent of the subscribers."). It could not—by way of example—define "an annoyance or nuisance to the neighborhood" to mean the keeping of any animal over 5 pounds in weight because that requirement would categorically exclude numerous common household pets without a finding of actual nuisance—that is, the interpretive bylaw would in effect amount to an additional burden on the land; and courts will not enforce restrictions that were not expressly stated in the covenants or permit the expansion of a restriction under the guise of interpretation. *O'Connor*, 459 Mich at 341; *Golf View*, 342 Mich at 130-131; *Kelly*, 245 Mich at 409.

On appeal, the Association and officers argue that Article XII of the bylaws does not amount to a new set of restrictions on the properties; rather, in Article XII, the Association merely interpreted the existing restrictions and provided guidance for the Association's enforcement of the restrictions. In particular, the Association and officers maintain that the architectural review committee is just enforcing paragraph eleven of the covenants and restrictions.

Paragraph eleven of the covenants and restrictions requires a property owner to obtain advanced permission before constructing various improvements and states that permission may be denied if the proposed improvement is not in harmony with the development:

> 11. <u>BUILDING APPROVAL</u>. No dwelling, structure, swimming pool, fence, TV disc, permanent sports type outdoor court or facility, out building, or other development shall be permitted upon any parcel in the development, nor shall any grade in the development be changed or other construction work done, unless Developer's written approval is obtained in advance as follows: The proposed plot plan, construction plans and specifications shall be submitted in duplicate to the Developer, for approval and said written approval received prior to submission to Salem Township for a Zoning Compliance Permit or Building Permit. The plot plans shall show the finished grade, the plot, the location of the dwelling, mailbox post and all other buildings and structures. The construction

plan and specifications shall show the size, square footage, type and materials of exterior construction together with the grade and elevation of all buildings and structures and shall provide other pertinent construction details. One copy of these plans and specifications shall be permanently retained by the Developer. Developer shall not give its approval to the proposal unless in its sole and absolute opinion such construction and development will comply in all respects with the building and use restrictions set forth in this document; nor shall Developer give its approval unless the external design, materials and location of the construction proposal shall be in harmony with the character of the development as it develops and with the topography and grade elevations both of the parcel upon which the proposed construction is to take place, and the neighboring parcels in the development. Developer shall have the right to assign his responsibilities and authority hereunder to a third party. If anyone begins any such construction without the above stated approval, he hereby agrees to forthwith completely remove such construction upon being informed by the Developer, regardless of the stage of completeness of such construction. If it is not appropriately removed, the Developer has the full right to enter upon such property and cause such construction to be removed; the cost of removal plus all appropriate legal expenses etc. shall be chargeable to the parcel owner and the Developer may place a lien upon the subject parcel for such charges plus applicable interest.

This restriction is poorly drafted and cluttered with legalese, but it does not give the Association the authority to require its members to seek the architectural review committee's approval before improving their lots or making changes to existing improvements on their lots. The first sentence awkwardly prohibits the 'permitting' of certain structures and prohibits changes to the grade of a parcel or construction without written approval from the developer. The first sentence further provides that the developer's approval must be obtained in "advance as follows" and ends with a colon. By introducing the remaining portion of the paragraph in this way, the drafter indicated that the remainder of the paragraph clarifies the procedures applicable to the developer's approval process. Moreover, the specific provisions in the remainder of the paragraph consistently state that the obligation and authority to review a proposed plan belongs to the developer. A person seeking approval must submit his or her plans to the *developer* and the *developer* must retain a copy. The *developer* must not give his approval if the proposal does not comply with the building and use restrictions or is not "in harmony with the character of the development as it develops . . ." The *developer* has the right to assign his "responsibilities and authority" to approve proposed plans to a third party and it is the *developer* who has the right to remove any construction commenced without his approval.

Paragraph 11 is not reasonably susceptible to more than one meaning. *Farm Bureau Mut Ins*, 460 Mich at 566. Rather, it unambiguously states that the individual lot owners have an obligation to get their proposed improvements approved by the developer before commencing construction; the paragraph does not establish an obligation to submit a proposal to any other person, the Association, or a committee of the Association. And the covenants define the developer to be Philip Conlin. To the extent that the Association had the authority to enforce paragraph 11, it had to enforce it by compelling property owners to submit their plans to the developer for approval and by requiring him to comply with the requirements imposed on his

review of the proposed plans—specifically, by requiring him to review the plans for compliance with the restrictions and for harmony with the development as it has developed. Thus, the Association had the authority to enforce this restriction by ensuring that the developer acted reasonably and in good faith when reviewing whether the proposed plan was in harmony with the development. See *Burkhardt v City Nat'l Bank of Detroit*, 57 Mich App 649, 652; 226 NW2d 678 (1975). But it could not unilaterally usurp that role for itself. Therefore, to the extent that Philip Conlin had not assigned his rights and duties as the developer, the trial court should have enforced this provision as written and concluded that—as a matter of law—the Association did not have the authority to establish its own independent approval process and require lot owners to submit to that process.

The Association and Officers, however, argue that the Association's power to abate a violation of the covenants and restrictions necessarily gives rise to a right to approve construction beforehand; specifically, they maintain that the Association "need not wait inefficiently for construction to occur and then seek to abate it. Rather, it can proactively approve a potential construction." The Association's argument is inapt; its bylaws do not provide that an individual lot owner *may* submit their proposed plans to the architectural committee for approval so as to avoid any potential future dispute or abatement action. The bylaws *require* the lot owners to submit their plans to the architectural committee rather than the developer. The bylaws further *require* the lot owners to pay a $2,000 fee and make a $5,000 deposit, which were not required in the original covenants. The bylaws also deprive the lot owners of a case-by-case determination concerning whether their proposed plan is in harmony with the development as it has developed (and in light of any change in the character of the development over the years) by *requiring* the proposed plan to conform to a detailed set of criteria not contemplated in the original covenants. That is, the bylaws effectively circumscribe the discretion of the developer or his assign to fairly and reasonably determine whether a proposed plan would be in harmony with the development as a whole. See *Ardmore Ass'n v Bankle*, 329 Mich 573, 578; 46 NW2d 378 (1951) (stating that a requirement that construction be preapproved is valid, but must be exercised in a fair and reasonable manner). These limits on the developer's discretion constitute an additional burden not contemplated by the original covenants and restrictions.

Relying on *Meadow Bridge Condominium Assoc v Bosca,* 187 Mich App 280; 466 NW2d 303 (1990), the Association argues that Article XII merely implements existing restrictions. The Association's reliance is, however, misplaced. In *Bosco*, the existing restrictions prohibited the maintenance of animals without the condo association's permission and broadly authorized the condo association to adopt any additional rules and regulations respecting animals that it may deem proper. *Id.* at 281. The condo association's authority to promulgate the new rule was, therefore, permitted by the existing rules. *Id.* at 282-283. Here, the original covenants and restrictions did not authorize the Association to adopt new rules or regulations, and the provisions in Article XII plainly impose restrictions which are inconsistent with the original recorded restrictions.

The bylaws unambiguously impose new burdens on the lot owners through the architectural committee's review process. Because the lot owners did not unanimously approve the creation of these new burdens and the original covenants did not authorize the Association to establish these new burdens with less than unanimous consent, they are contrary to law and

invalid. *Eveleth*, 322 Mich at 641-642; *Ardmore Park Subdivision Ass'n*, 117 Mich App at 62. If the Association, through its architectural review committee, has any authority to require lot owners to submit their proposed plans to the committee for preapproval, that power must be derived from the assignment of the developer's authority to it. But, even if Philip Conlin assigned his right to preapprove proposed plans to the Association, the committee's power of approval would be subject to the same criteria and limits that were applicable to the developer under paragraph 11; thus, the additional burdens stated in article XII are still invalid.

The Association also cannot derive its authority to require a property owner to submit its plans for preapproval from any other covenant. None of the other paragraphs expressly require an owner to submit a proposed change to his or her property to the other owners, the developer, or any entity. For example, paragraph one of the covenants requires each lot to be used as a "single family residence" and further limits the types of improvements that may be made on the lot:

> No building or other structure shall be permitted on any lot other than a single family dwelling with an attached garage of not less than three car capacity; except that a swimming pool, tennis court, or similar facility, walls or other accessory buildings may be built in such a manner and location deemed to be in harmony with the character of the development, and in conformity with these building and use restrictions . . . .

The harmony provision in this restriction applies to "a swimming pool, tennis court, or similar facility, walls or other accessory building" and not to the single family dwelling and its attached garage.

Similarly, the abatement provision stated under paragraph 29 grants the Association (along with the developer) the authority to take action to redress a purported violation of the covenants and restrictions, but that paragraph does not expressly grant the Association the authority to require preapproval for every improvement that might be the subject of an action to abate. It provides that the Association has, "in addition to all other remedies, the right to enter upon the land as to which such violation or breach exists, and summarily to abate and remove [the violation], at the expense of the owner . . . ." Nevertheless, the land owner may proceed at his or her own risk and the Association's only recourse is to take legal action or abate the perceived noncompliance. The Association does not have the authority to compel the owner to submit a proposed change to the Association, does not have the authority to order the owner to pay a review fee, and does not have the authority to order the owner to pay a deposit. Rather, the Association must proceed to abate at its own expense (and risk), and, if the owner was in fact violating the covenants or restrictions, the Association may seek compensation for its expenses. Paragraph 29 expressly permits nothing more. *Id.*

The instruments at issue in this appeal—the 2001 covenants and restrictions, along with the Association's articles of incorporation and bylaws—are not ambiguous. Further, with one exception to be discussed below, the application of the law to the provisions at issue did not involve a question of fact. Therefore, the jury should not have been asked to "find" whether the bylaws amounted to new restrictions and should not have been asked to "find" whether the bylaws conflicted with the covenants and restrictions recorded in 2001.

The bylaws imposed additional burdens on the lots in Dixboro Farms. Because it was undisputed that the bylaws were not unanimously adopted, and the 2001 covenants and restrictions did not expressly permit the Association to burden the lots with new restrictions on its own initiative or allow the owners to alter or adopt restrictions with less than unanimous consent, the new restrictions were invalid. *Eveleth*, 322 Mich at 641-642; *Ardmore Park Subdivision Ass'n*, 117 Mich App at 62. Consequently, the trial court should have determined that Article XII of the bylaws was invalid under Michigan law, but only to the extent that it burdened the lots in Dixboro Farms with restrictions and covenants beyond those provided in the 2001 covenants and restrictions. The extent to which Article XII of the bylaws imposed additional burdens on the lots, however, depended in part on the resolution of a question of fact.

## C. ASSIGNMENT OF RIGHT TO APPROVE

Paragraph 11 of the covenants gave Philip Conlin—as the developer—the "right to assign his responsibilities and authority hereunder to a third party." The covenants do not include any limitations or conditions on his right to assign. Therefore, he could assign his right to the Association expressly by oral or written agreement or impliedly through his representations and course of conduct. *Burkhardt v Bailey*, 260 Mich App 636, 654-656; 680 NW2d 453 (2004) (discussing the elements necessary to establish an assignment and stating that the assignor must manifest a present intent to transfer and must not retain any control or any power of revocation); *Featherston v Steinhoff*, 226 Mich App 584, 589; 575 NW2d 6 (1997) ("Where the parties do not explicitly manifest their intent to contract by words, their intent may be gathered by implication from their conduct, language, and other circumstances attending the transaction."); see also, e.g., *Hooton v Hooton*, 230 Mich 689, 692; 203 NW 475 (1925) (discussing whether the facts established that the husband made a parol assignment of the insurance policy at issue to his wife).

At trial, there was testimony that the owners of the lots in Dixboro Farms were upset by the quality of the Guenther homes and felt betrayed by Philip Conlin's approval of those homes. Philip Conlin testified that he became aware of the other owners' discontent shortly after the homes were completed. As a result of the owners' concern, Chris Conlin sent an email to Philip Conlin in December 2010 requesting that he appoint the board of directors for the Association and call a meeting of the residents. Chris Conlin further wrote that it was "understood" that the new board would form an architectural committee at this first meeting. Thereafter, Philip Conlin appointed the Association's first board of directors.

There was testimony and documentary evidence that the homeowners met in January 2011 and signed a written summary of their position on the recent events, which they sent to Philip Conlin. In the letter, they stated that they had reached a consensus on "a number of issues" and were sending him the letter to "inform" him about their decisions and seek his "concurrence in the progress and basis of continuing cooperation." They told Philip Conlin that they wanted to elect their own board for the Association, notwithstanding that he had that right under the covenants, and wrote that they expected him to "concur" with this decision. The homeowners also "acted to appoint" an architectural control committee to "cooperate and assist in maintaining architectural harmony in the subdivision." Finally, the homeowners stated that they intended to develop bylaws for the Association and asked him to indicate his "acceptance and acknowledgement" of the newly formed Association. The evidence showed that Philip

Conlin signed and dated the letter. There was evidence that Philip Conlin later submitted proposed plans for development to the Association's newly formed architectural review committee, albeit for its comments and suggestions.

Although it was by no means overwhelming, when the totality of the evidence is viewed in the light most favorable to the Association, there is evidence from which a reasonable jury could find that Philip Conlin assigned his rights under paragraph 11 of the covenants to the Association. See *Taylor*, 286 Mich App at 500. If the jury had found that Philip Conlin assigned his rights under that paragraph to the Association, it could properly form an architectural review committee to handle the approval process and could promulgate rules in its bylaws governing that process, so long as the rules did not impose burdens beyond those provided under paragraph 11 of the covenants. Consequently, the trial court did not err when it denied the Developers' motion for a directed verdict on that limited issue.

Unfortunately, the special verdict form instructed the jury to skip that issue if it found that the bylaws did not amount to restrictive covenants and did not violate the 2001 covenants and restrictions, which it did. For that reason, this fact-question was not resolved below. Although we conclude that Article XII of the bylaws was invalid to the extent that it imposed new burdens on the lots at issue without the proper consent or authority, we cannot determine the full extent that Article XII would be invalid without resolving this factual question. Consequently, we must remand this case for possible retrial of that question of fact.

III. CONCLUSION

We reverse the jury's verdict, vacate the judgment, and remand for further proceedings. On remand, the trial court shall enter an order granting partial summary disposition in favor of the Developers. Specifically, the trial court shall enter an order declaring that the 2001 covenants and restrictions did not give the Association the authority to burden the lots with additional restrictions and did not give it the authority to add restrictions with less than unanimous approval. The order should further declare that Article XII of the bylaws is invalid and does not apply to the Association's members to the extent that it includes burdens on their lots beyond those stated under the 2001 covenants and restrictions, as explained in this opinion. Finally, if necessary, the trial court shall hold a new trial to resolve whether Philip Conlin assigned his rights under paragraph 11 of the covenants to the Association.

Reversed, vacated, and remanded for further proceedings consistent with this opinion. Because this appeal involved issues of importance to the general public, we order that none of the parties may tax their costs. MCR 7.219(A). We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Douglas B. Shapiro

-16-