STATE OF MICHIGAN
COURT OF APPEALS

WILLIAM WENTWORTH, JR., MARTHA
SANFORD, W. S. MANAGEMENT, LLC, and
APPLE MICHIGAN, INC.,

Plaintiffs-Appellants,

v

WILLIAM WENTWORTH, SR.,

Defendant-Appellee.

UNPUBLISHED
October 17, 2017

No. 333030
Genesee Circuit Court
LC No. 15-104771-CK

Before: GLEICHER, P.J., and FORT HOOD and SWARTZLE, JJ.

PER CURIAM.

Plaintiffs, William Wentworth, Jr. (hereinafter "Junior"), Martha Sanford (hereinafter "Martha"), W. S. Management, LLC (hereinafter "WSM"), and Apple Michigan, Inc. (hereinafter "AMI"), appeal as of right the trial court's order granting defendant's motion for summary disposition pursuant to MCR 2.116(C)(10). We affirm.

I. FACTUAL BACKGROUND

In 1992, defendant went into the restaurant business as a franchisee of a restaurant chain. Defendant set up a limited partnership, the Miller Apple Limited Partnership (hereinafter "MALP"), where AMI was the general partner. At the inception, defendant was the sole stockholder, director, and president of AMI. When the first restaurant opened, MALP, as the franchisee, entered into a management agreement with AMI, delegating the managerial responsibilities of the restaurant to AMI in exchange for a management fee. Defendant's children, Junior and Martha, soon joined the business. Eventually, Junior and Martha were officers of AMI.

After the business experienced a number of years of growth, defendant, Junior, and Martha[1] met in late 2003 at the Holiday Inn Gateway in Flint, Michigan (hereinafter referred to

---

[1] Martha's husband, Timothy Sanford, averred in his July 8, 2015 affidavit that he attended the Gateway Meeting as well. Defendant also testified at his deposition that he remembered Timothy at the meeting.

as the "Gateway Meeting"). While there is no dispute that the meeting occurred, there is significant disagreement as to what occurred at the meeting. Junior and Martha both claimed in their sworn affidavits that they called the meeting "to inform [defendant] that in order for us to continue to stay on and work in the Business we needed to become owners and have more formal authority to act on behalf of and make decisions in regard to Business operations." They both assert that defendant "agreed and promised us we were from that day forward to be shareholders, officers and directors of [AMI]." Because defendant "was the sole Shareholder and Director at that time we knew he had authority to make that decision and were, therefore, satisfied the issue had been resolved." At his deposition, defendant claimed that he could not remember who called the meeting, and he did not know whether it was called because Junior and Martha were dissatisfied with their current status in the company. When asked if he recalled telling his children that they would become directors of AMI, defendant said "I do not." When asked if he had "reason to dispute that conversation occurred," defendant said, "I don't believe I would ever say such a thing."

At the end of 2003, Junior and Martha were gifted two shares each out of the 100 shares of AMI stock held solely by defendant. Defendant, Junior, and Martha—as shareholders—also began signing waivers of notice of joint annual meetings. Starting in 2004, the annual meeting minutes provided under the "Shareholders Meeting" section a provision stating, "After nominations were made and accepted, the following individual was elected as the sole Director of the Corporation, to serve for a period of one year, or until such time as his successor is elected and qualify[s]: William M. Wentworth, Sr." At the end of the meeting minutes, defendant signed with the title, "Shareholder and Director," while Junior and Martha both signed with the title, "Shareholder." Each year, the minutes indicated that defendant was elected the sole director, and defendant, as director and shareholder, and Junior and Martha, as shareholders only, signed the annual meeting minutes. Junior and Martha signed these meeting minutes up through 2013. In 2006, defendant transferred another two shares of AMI stock to Junior and another two shares of AMI stock to Martha, wherein defendant retained 92 shares of AMI stock.

According to AMI's attorney, George Rizik, defendant approached him in 2007 for the purpose of adding Junior and Martha to the board of directors. For that reason, Rizik prepared a draft of bylaws in 2007, but they were never signed. Rizik said that he drafted the bylaws with the purpose of modifying the original bylaws "to show that there were going to be three directors, and that it didn't identify in the bylaws who the directors were going to be." Based on his discussions with defendant, "[t]he directors were going to be [defendant], [Junior], and [Martha]." The only change from the 1992 bylaws was "the change to three directors from one director."

On June 18, 2012, MALP and AMI entered into a third amended and restated sub-management agreement with Junior and Martha's company, WSM, wherein WSM would "carry out and discharge each and every duty, obligation, undertaking, and responsibility of Manager under the Management Agreement for the Businesses." The contract allowed AMI to terminate the sub-management agreement on the anniversary date of the agreement. Thereafter, Junior and Martha received a management fee from AMI for the management of the restaurants.

In late 2012, AMI's stock was recapitalized into Class A voting stock and Class B nonvoting stock. After the recapitalization, defendant retained a 46% interest in AMI while

Junior and Martha had a combined 54% interest in AMI. However, defendant had 92% of the voting control. In 2015, defendant terminated the sub-management agreement with WSM.

## II. PROCEDURAL HISTORY

Plaintiffs filed their first amended verified complaint, alleging against defendant (1) tortious interference with the sub-management agreement, (2) breach of the 2007 bylaws, (3) minority shareholder oppression, (4) breach of fiduciary duty to Junior, Martha, and AMI, and (5) promissory estoppel. After full discovery, defendant filed a motion for summary disposition pursuant to MCR 2.116(C)(10). At the heart of defendant's motion was the argument that all of plaintiffs' claims depended on whether Junior and Martha were directors of AMI, and after discovery, there was no evidence proving anyone other than defendant was ever a director. After a hearing on defendant's motion for summary disposition, the trial court granted defendant's motion, holding that Junior and Martha were not directors of AMI, the 2007 bylaws were not adopted, and summary disposition was proper as to all of plaintiffs' claims. On appeal, plaintiffs argue that there is a genuine issue of material fact that (1) they were elected directors of AMI, (2) the 2007 bylaws were adopted, and (3) even if they are not directors, their claims for tortious interference of contract, minority shareholder oppression, and breach of fiduciary duty should have survived summary disposition.

## III. STANDARD OF REVIEW

This Court reviews de novo a trial court's granting of a defendant's motion for summary disposition under MCR 2.116(C)(10). *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003). This Court considers "the affidavits, pleadings, depositions, admissions, and other documentary evidence in the light most favorable to the party opposing the motion." *Liparoto Constr, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 29; 772 NW2d 801 (2009). Summary disposition is appropriate under MCR 2.116(C)(10) when there is not a genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). Statutory interpretation is a question of law that is reviewed de novo. *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 739; 641 NW2d 567 (2002). Like the interpretation of statutes, the interpretation of bylaws also presents a question of law that is reviewed de novo. *Slatterly v Madiol*, 257 Mich App 242, 250; 668 NW2d 154 (2003).

## IV. ANALYSIS

### A. DIRECTORSHIP

Plaintiffs first claim that the trial court erred when it concluded that defendant was the sole director of AMI, and therefore, ruling that summary disposition was appropriate as to the

tortious interference of contract claim, breach of the 2007 bylaws claim, and promissory estoppel claim.[2] We disagree.

"Generally, an entity's bylaws or membership agreement may provide for the regulation and management of its affairs as long as the provision is not inconsistent with law or the articles authorizing the entity." *Conlin v Upton*, 313 Mich App 243, 254-255; 881 NW2d 511 (2015), citing MCL 450.1231 and MCL 450.4210. Further, "[t]he bylaws of a corporation constitute a contract between a corporation and its shareholders." *Great Lakes Shores, Inc v Bartley*, 311 Mich App 252, 255; 874 NW2d 416 (2015) (citation omitted). Therefore, "[b]ylaws are generally construed in accordance with the same rules used for statutory construction." *Slatterly*, 257 Mich App at 250.

According to plaintiffs, there was ample evidence in the record to create a genuine issue of material fact as to whether defendant elected Junior and Martha to the board of directors at the Gateway Meeting. Whether Junior and Martha were elected to the board of directors mandates a review of AMI's relevant bylaws, as well as the requirements under the Michigan Business Corporation Act (MBCA), MCL 450.1101 *et seq*. The parties do not dispute that the 1992 bylaws were in effect in 2003 when the Gateway Meeting occurred. Article V, Section 5.02 of the 1992 bylaws, which governs the election of directors, states, in pertinent part, as follows:

> 5.02 Election, Resignation and Removal. Directors shall be elected at each annual meeting of the shareholders, each to hold office until the next annual meeting of shareholders and until the director's successor is elected and qualified, or until the director's successor is elected and qualified, or until the director's resignation or removal. A director may resign by written notice to the corporation. A resignation is effective upon its receipt by the corporation or a subsequent time as set forth in the notice of resignation. A director or the entire Board of Directors may be removed, with or without cause, by vote of the holders of a majority of the shares entitled to vote at an election of directors.

The MBCA includes procedures for the election of directors that are in line with the 1992 bylaws: "At the first annual meeting of shareholders and at each annual meeting thereafter, the shareholders shall elect directors to hold office until the succeeding annual meeting . . . ." MCL 450.1505(2).

Based on both the 1992 bylaws and the MBCA, AMI's directors must be elected at the annual meeting of the shareholders. Under Article IV, Section 4.02 of the 1992 bylaws, which govern the rights of shareholders, "The annual meeting of the shareholders of the corporation shall be held on the last Monday of the sixth calendar month after the end of the corporation's

---

[2] In their reply brief, plaintiffs advance a cursory argument concerning whether the trial court properly granted summary disposition of their claim of promissory estoppel. Where this issue was not properly presented to this Court as it was not included in plaintiffs' statement of the issues on appeal, we consider it waived and decline to address it. *Bruley v City of Birmingham*, 259 Mich App 619, 631 n 28; 675 NW2d 910 (2003).

fiscal year at 2 o'clock in the afternoon or on such other date and time as may be determined by the Board of Directors." Junior and Martha both admit that they called the Gateway Meeting in 2003 to express their concerns. Even assuming defendant, as the sole director, "determined" to hold the annual meeting in 2003 at the Gateway Center, plaintiffs failed to provide any documentation detailing the proceedings. Under Article X, Section 10.01, the 1992 bylaws state, "The proper officers and agents of the corporation shall keep and maintain such books, records and accounts of the corporation's business and affairs, minutes of the proceedings of its shareholders, Board and committees . . . ." Similarly, MCL 450.1485 states that "[a] corporation shall keep books and records of account and minutes of the proceedings of its shareholders, board, and executive committee, if any." Further, the MBCA requires that "[a]ny of the books, records, or minutes may be in written form or in any other form capable of being converted into written form within a reasonable time." MCL 450.1485. Plaintiffs do not dispute that there were no official records kept of the Gateway Meeting. No minutes were taken, nothing was put in writing, and there was nothing "capable of being converted into written form within a reasonable time." MCL 450.1485. Thus, assuming defendant did, in fact, agree to elect Junior and Martha to the board of directors there is nothing that documents this transaction as required under the 1992 bylaws or MCL 450.1485. As such, the trial court correctly concluded that there can be no genuine issue of material fact relating to whether plaintiffs were elected directors of AMI.

Further, plaintiffs' argument fails even if this Court were to assume that defendant's oral promise was sufficient to elect Junior and Martha to the board of directors. In December of 2003, after the Gateway Meeting, defendant gifted Junior and Martha stock, effectively making them shareholders of AMI. From 2004 to 2013, Junior and Martha signed an annual waiver of notice of the annual meeting of the shareholders and directors. Each year, Junior and Martha signed the annual meeting minutes. And each year, defendant was re-elected as the sole director of AMI. However, despite the overwhelming documentary evidence in line with the bylaws and the MBCA, plaintiffs challenge the annual minutes on a number of grounds. As stated below, these arguments are without merit.

First, plaintiffs claim the meeting minutes document "fictitious meetings that never occurred." However, as defendant properly argues, the 1992 bylaws and the MBCA allow for the documentation of annual meeting minutes even if those meetings were never actually held. Article VI, Section 6.03 of the 1992 bylaws provides:

> 6.03 Action Without a Meeting. Except as may be provided otherwise in the Articles of Incorporation for action to be taken by shareholders, any action required or permitted at any meeting of shareholders or directors or committee of directors may be taken without a meeting, without prior notice and without a vote, if all of the shareholders or directors or committee members entitled to vote thereon *consent thereto in writing*. [Emphasis added.]

Congruent with the 1992 bylaws, the MBCA provides:

> Unless prohibited by the articles of incorporation or bylaws, action required or permitted to be taken under authorization voted at a meeting of the board or a committee of the board, may be taken without a meeting if, before or after the action, all members of the board then in office or of the committee consent to the

action in writing or by electronic transmission. The written consents shall be filed with the minutes of the proceedings of the board or committee. The consent has the same effect as a vote of the board or committee for all purposes. [MCL 450.1525.]

On the basis of the above controlling provisions, there was not a requirement that the meetings be conducted in person, so long as all the shareholders consented to the corporate actions that would have necessitated a meeting. Junior and Martha signed the minutes each year from 2004 to 2013, thereby waiving an in-person meeting and electing defendant as the sole director of AMI.

Plaintiffs also argue that Roger Isaac, one of AMI's corporate attorneys, presented Junior and Martha with the meeting minutes each year, but they were simply told to sign the minutes. According to Junior and Martha, they never actually read the minutes and never realized they were voting to elect defendant the sole director of AMI. However, it is well-settled that a failure to read the contract is not a defense to enforcement of the contract terms. *Watts v Polaczyk*, 242 Mich App 600, 604; 619 NW2d 714 (2000).

Finally, plaintiffs argue that they presented ample evidence showing the parties' intent to make Junior and Martha directors of AMI, and that such evidence creates a genuine issue of material fact as to that issue. However, "[t]he general rule is that a shareholder who assents to a corporate transaction may not later challenge the validity of the transaction in court." *Camden v Kaufman*, 240 Mich App 389, 392; 613 NW2d 335 (2000). According to the meeting minutes, from 2004 to 2013, Junior and Martha, as shareholders of AMI, consented to the election of defendant as the sole director of AMI. Plaintiffs' now challenge this action by presenting affidavits, deposition testimony, and documents where Junior and Martha signed corporate documents as directors and shareholders. However, the presentation of this evidence simply does not defeat the fact that they both signed the meeting minutes and assented to the election of defendant as sole director. Plaintiffs, however, highlight the fact that this Court also held that "*absent special circumstances*, [the] plaintiff is precluded from proceeding with this litigation because of his approval of the transaction." *Id*. at 392-393 (emphasis added). Thus, plaintiffs claim they should be able to challenge the election of defendant as the sole director because there were special circumstances meriting relief. First, the meetings were never actually held. Second, there is no dispute that the 2003 Gateway Meeting was conducted, and multiple people are willing to testify that defendant elected Junior and Martha to the board of directors. We disagree.

This Court's decision in *Camden* did not define "special circumstances." However, this Court explained that in certain cases, "a plaintiff may maintain an action if it is demonstrated that complaining to the directors or requesting that they act differently would have been futile." *Id*. at 393. Plaintiffs have not shown that the circumstances here meet the exception. Junior and Martha could have refused to consent to a waiver of the annual meeting and then voted to elect themselves to the board of directors at the annual meeting of the shareholders—or at a special meeting pursuant to Section 4.03 of the 1992 bylaws. Instead, they repeatedly consented to the waiver of the annual meeting, as well as the election of defendant as the sole director. Their only excuse was that they did not read the annual meeting minutes. Just as in *Camden*, a failure to read the corporate documents will not provide a defense to the general rule that a shareholder

-6-

cannot challenge a corporate action that he consented to, especially when the consent was in writing. *Camden*, 240 Mich App at 392. Because Junior and Martha cannot challenge the fact that they elected defendant the sole director, the trial court correctly recognized that plaintiffs cannot now bring a claim as directors challenging defendant's conduct. *Id*. at 393.

## B. THE 2007 BYLAWS

Plaintiffs argue, however, that Rizik drafted the 2007 bylaws on defendant's orders and that they are, therefore, controlling regardless of whether they were signed. Thus, according to plaintiffs, the 2007 bylaws, as controlling, prove that (1) Junior and Martha were directors, (2) after 2007, AMI could not have less than three directors, and (3) defendant breached those bylaws when he terminated the sub-management agreement without Junior and Martha's input as directors. As support, plaintiffs claim that nothing in the bylaws require the signatures from shareholders or directors to amend, alter, or repeal the bylaws. We disagree.

According to Article XII, Section 12.01 of the 1992 bylaws:

The Bylaws of the corporation may be amended, altered or repealed, in whole or in part, by the shareholders or by the Board of Directors at any meeting duly held in accordance with these Bylaws, provided that notice of the meeting includes notice of the proposed amendment, alteration or repeal.

Similarly, the MBCA states, in pertinent part:

The shareholders or the board may amend or repeal the bylaws or adopt new bylaws unless the articles of incorporation or bylaws provide that the power to adopt new bylaws is reserved exclusively to the shareholders or that the bylaws or any particular bylaw shall not be altered or repealed by the board. [MCL 450.1231.]

According to the 1992 bylaws, "The Bylaws of the corporation may be amended, altered or repealed, in whole or in part, by the shareholders or by the Board of Directors at any meeting duly held *in accordance with these Bylaws*." (Emphasis added.) In order to hold a meeting in accordance with the bylaws, a meeting must have been held where the shareholders voted to amend, alter, or repeal the 1992 bylaws. Plaintiffs do not assert that any such meeting occurred. While Section 6.03 of the bylaws allows for action without a meeting, the directors or shareholders "entitled to vote" must "consent thereto in writing." Even though the bylaws could be amended, altered, or repealed by just the directors, and even if defendant was the sole director entitled to vote to amend or repeal the bylaws, the record does not evidence that defendant consented in writing. Defendant signed the 1992 bylaws, evidencing his consent to adopt those bylaws. However, the 2007 bylaws were never signed, and therefore, plaintiffs have not shown that any proper action was taken that would prove the 2007 bylaws were adopted without a meeting. Even so, plaintiffs continue to argue that Rizik's deposition testimony creates a genuine issue of material fact because Rizik claimed that defendant approached him and ordered the new bylaws for the sole purpose of making Junior and Martha directors of AMI. This argument is not persuasive.

-7-

Assuming that defendant did, in fact, order Rizik to draft the 2007 bylaws, Rizik admitted that he sent a copy of the draft bylaws to defendant, Junior, and Martha, but he never heard from them again. Rizik was asked, "And [defendant] took them and what happened after that, to your knowledge?" Rizik responded, "I don't know. I do not know. It wasn't unusual that I didn't get signed things back." Additionally, Rizik explained that he believed that Junior and Martha were directors of AMI "[j]ust from general discussions [with defendant, Junior and Martha] since 2007." Rizik also explained that on rare occasions, defendant, Junior, and Martha would meet to go over issues with the company, such as lawsuits against AMI, and the three would make decisions together. However, Rizik conceded that his impressions were his "characterization[s]" of what he perceived. Notably, Rizik did not claim that the bylaws purporting to make defendant, Junior, and Martha directors were actually signed and adopted. In our view, reasonable minds could not differ with respect to whether the 2007 bylaws were adopted. *Allison*, 481 Mich at 425. Accordingly, summary disposition was appropriate.

## C. THE REMAINING CLAIMS

Plaintiffs argue that their claims for (1) tortious interference of contract, (2) minority shareholder oppression, and (3) breach of fiduciary ought to have survived defendant's motion for summary disposition regardless of whether they are directors of AMI. We disagree.

In his March 25, 2016 affidavit, defendant stated that in 2011 he owed his ex-wife five million dollars pursuant to a divorce property settlement. Defendant further averred that he, Junior, and Martha agreed to have AMI borrow $5.7 million dollars, allowing defendant to pay his ex-wife without pledging his stock in the property settlement, avoiding the risk that his ex-wife could obtain ownership of the company upon default. Defendant's affidavit further confirms that in 2012, defendant also gifted stock to his two children that gave them a combined 54% interest in AMI. According to defendant, because of the increase from a combined 8% ownership interest to a combined 54% ownership interest, his children were receiving substantially more in distributions than in previous years. Therefore, defendant claimed he was receiving less in distributions and expected a change to the sub-management agreement "that would have reduced the impact of this gift on [defendant's] own cash flow[.]" Further, defendant averred that he "met with Junior and Martha to discuss changes" to the sub-management agreement "that would eliminate the unintended reduction in [defendant's] income that had been caused by the 2012 gift and the recent tax changes attributable to the Affordable Care Act." Defendant also explained that "changes" were needed in order to provide his wife with "better financial security" upon defendant's death. Therefore, he discussed a possible price for Junior's and Martha's purchase of defendant's stock when he died. However, "[a]fter trying to resolve this for almost a year, [defendant] finally concluded that Junior and Martha would never agree to the changes that were contemplated at the time of the 2012 stock gift[,]" and defendant subsequently decided to terminate the sub-management agreement.

Defendant openly admits in his affidavit that the decision to terminate the sub-management agreement was motivated, at least in part, by his need to increase his own personal cash flow. His recent divorce, the gifts of stock, and Junior and Martha's unwillingness to change the terms of the sub-management agreement all factored into defendant's decision to terminate the agreement. Plaintiffs counter defendant's assertions by arguing, in pertinent part:

[Defendant] has not run or managed the business for over [15 years], yet he purported to terminate the management agreement with [WSM] without any alternative, to take check signing authority away from the only two people who have run the business [in the past 15 years] with little or no participation from [defendant], and to redirect all the management fees to a bank account controlled by [defendant] alone.

## 1. TORTIOUS INTERFERENCE OF CONTRACT

Plaintiffs argue that while defendant, as director of AMI, had the ability to terminate the sub-management agreement, he did so for his own benefit, not for the benefit of AMI. We disagree.

"The elements of a tortious interference with a contract are: (1) a contract, (2) a breach, and (3) an unjustified instigation of the breach by the defendant." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 382; 689 NW2d 145 (2004) (citation omitted). Moreover, "[t]o maintain a cause of action for tortious interference, the plaintiff must establish that the defendant was a 'third party' to the contract rather than an agent of one of the parties acting within the scope of its authority as an agent." *Lawsuit Fin, LLC v Curry*, 261 Mich App 579, 593; 683 NW2d 233 (2004), quoting *Reed v Mich Metro Girl Scout Council*, 201 Mich App 10, 13; 506 NW2d 231 (1993). "[C]orporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation." *Reed*, 201 Mich App at 13 (citation omitted).

When considering the evidence in a light most favorable to plaintiffs, the evidence shows that even if termination of the sub-management agreement benefited defendant, it also benefitted AMI. As a result of defendant terminating the sub-management agreement, AMI was no longer required to pay a management fee to WSM, meaning it was retaining the entire 20% management fee from MALP.[3] Even if we accept plaintiffs' assertions that defendant's sole motivation in terminating the contract was to benefit defendant himself, the evidence fails to prove "no benefit to the corporation." *Id*. Therefore, summary disposition of this claim was appropriate.

## 2. MINORITY SHAREHOLDER OPPRESSION

Plaintiffs argue that their minority shareholder oppression claim survives summary disposition because even if they were not directors of AMI, there was still a genuine issue of material fact as to whether defendant's actions were oppressive to Junior and Martha as minority shareholders. We disagree.

---

[3] According to AMI's accountant, AMI was paying WSM between approximately $500,000 and $1 million annually.

A minority shareholder oppression claim stems from MCL 450.1489 of the MBCA, which states: "(1) A shareholder may bring an action in the circuit court . . . to establish that the acts of the directors or those in control of the corporation are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder." MCL 450.1489(1); see *Madugula v Taub*, 496 Mich 685, 697; 853 NW2d 75 (2014) (stating that MCL 450.1489 is "commonly known as the shareholder-oppression statute[.]") Oppressive conduct is defined as "a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder." MCL 450.1489(3).

Despite plaintiffs' claim to the contrary, the termination of the sub-management agreement did not substantially interfere with Junior and Martha's interest "as a shareholder." MCL 450.1489(3). Put another way, the record reflects that any benefit to AMI derived from the termination of the agreement would also directly benefit Junior and Martha as the shareholders of AMI. We acknowledge that plaintiffs provided a letter from defense counsel that they no longer had check-signing capabilities and would not receive management funds pursuant to the sub-management agreement. Instead, those funds were to be distributed to an account controlled solely by defendant—the president and director of AMI. However, there is nothing to suggest that defendant prevented them from receiving their proper distributions, and they, in fact, provided an affidavit from AMI's accountant who admits that "[s]ince the stock gift, [defendant's] dividends have *decreased* and [Junior's] and Martha's have *increased*" as was contemplated from the stock gift exchange. Accordingly, there was no genuine issue of material fact as to whether plaintiffs were harmed *as shareholders*, and the minority shareholder oppression claim fails.

### 3. BREACH OF FIDUCIARY DUTY

Plaintiffs argue that defendant violated his duty to act in good faith and for the best interest of AMI and the minority shareholders when he terminated the sub-management agreement. We disagree.

MCL 450.1541a provides the standard of care of directors and officers and states the following in pertinent part:

(1) A director or officer shall discharge his or her duties as a director or officer including his or her duties as a member of a committee in the following manner:

(a) In good faith.

(b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances.

(c) In a manner he or she reasonably believes to be in the best interests of the corporation. [MCL 450.1541a(1)(a)-(c).]

The provisions under MCL 450.1541a authorize actions against directors and officers if they violate these duties. Accordingly, majority shareholders owe fiduciary duties to the corporation and to minority shareholders. *Salvadore v Connor*, 87 Mich App 664, 675; 276 NW2d 458 (1978). While the MBCA provides a standard of care for directors, " '[a] court

should be most reluctant to interfere with the business judgment and discretion of directors in the conduct of corporate affairs.' " *Dumas v Auto Club Ins Ass'n*, 437 Mich 521, 531; 473 NW2d 652 (1991), quoting *In re Butterfield Estate*, 418 Mich 241, 255; 341 NW2d 453 (1983) (alteration in original). Bad faith can exist when the actor "is motivated by selfish purpose or by a desire to protect [his] own interests at the expense of" those to whom he owes a fiduciary duty. *Commercial Union Ins Co v Liberty Mut Ins Co*, 426 Mich 127, 137; 393 NW2d 161 (1986). Defendant initially argues that Junior and Martha cannot bring their claim as individual shareholders because it is derivative, i.e., the harm alleged to them as shareholders is the same as the harm alleged to AMI. We agree.

"In general, a suit to enforce corporate rights or to redress or prevent injury to the corporation, whether arising out of contract or tort, must be brought in the name of the corporation and not that of a stockholder, officer or employee." *Mich Nat'l Bank v Mudgett*, 178 Mich App 677, 679; 444 NW2d 534 (1989). Further, "where the alleged injury to the individual results only from the injury to the corporation, the injury is merely derivative and the individual does not have a right of action against the third party." *Id*. at 680. While plaintiffs rely on *Salvadore* for the position that a minority shareholder is owed fiduciary duties, it does not defeat the rule that the alleged injury to the shareholder does not result from the injury to the corporation. Instead, a shareholder may file suit individually if he or she "can show a violation of a duty owed directly to . . . [him] that is independent of the corporation[.]" *Belle Isle Grill Corp v Detroit*, 256 Mich App 463, 474; 666 NW2d 271 (2003), citing *Mich Nat'l Bank*, 178 Mich App at 679.

Plaintiffs have failed to show how they were harmed *as shareholders*. The termination of the sub-management agreement certainly prevented Junior and Martha from collecting their management fee based on WSM's contract with AMI, but they did not show any injury to their interests as shareholders. To the contrary, as noted above, the affidavit from AMI's accountant confirms that as a result of the increase in Junior and Martha's interest in AMI, they were receiving increased distributions while defendant's distributions were decreasing. Thus, any harm remaining would have been to AMI, and an individual shareholder's claim will not survive if the harm is the same. *Mich Nat'l Bank*, 178 Mich App at 679-680. Therefore, the question turns on whether the termination of the sub-management agreement constituted a breach of fiduciary duty to AMI as a corporation.[4]

However, even when viewing the evidence in a light most favorable to plaintiffs, AMI's claim against defendant is unavailing. While defendant clearly had a personal motivation for cancelling the sub-management agreement, there is no evidence that the action injured the corporation. In fact, as stated previously, as a result of the termination, AMI was no longer

---

[4] Defendant argues that plaintiffs failed to address this aspect of the issue, thereby abandoning it on appeal. However, plaintiffs argued that defendant's conduct amounted to a breach of fiduciary duty as to Junior, Martha, *and* AMI as a corporation. Therefore, plaintiffs have not abandoned this issue.

required to pay a percentage of its management fee to WSM. As indicated in the financial sheet from AMI's accountant, WSM's management fee had steadily increased from approximately $500,000 in 2007 to over $1 million in 2015. Accordingly, courts must be "reluctant to interfere with the business judgment and discretion of directors in the conduct of corporate affairs." *Dumas*, 437 Mich at 531 (citation and quotation marks omitted). While there clearly was personal motivation on defendant's part to terminate the sub-management agreement, plaintiffs have not overcome the presumption that the termination of the contract resulted from sound business judgment. Therefore, summary disposition was proper as to the breach of fiduciary duty claim.

Affirmed. Defendant, as the prevailing party, may tax costs pursuant to MCR 7.219.


/s/ Elizabeth L. Gleicher
/s/ Karen M. Fort Hood
/s/ Brock A. Swartzle