*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WILLIAM KRAUS and BARBARA KRAUS,

        Plaintiffs/Counterdefendants-
        Appellees,

v

MICHAEL LINK, LEANNE LINK, JAMES
ASCENCIO, DAVID SAWECKI, KEVIN
BATES, RENEE BATES, MARK KRYSKA,
IRINA KRYSKA, and ZACHARY
RZOTKIEWICZ,

        Defendants/Counterplaintiffs-
        Appellants,

and

WESLEY LECKENBY, TERRY OSMUN,
DAPHNE SMITH, MARK ASHBAUGH, JOHN
BUCHANAN, RAUL UNZUETA, BRYAN
HOFFMEYER, LEE BREWER, MARGARET
BREWER, DAVID COOK, KEITH CLARK,
KRISTA CLARK, MATTHEW ALLISTON,
RAYMOND COOK, ROBERT WALEGA,
LAWRENCE WESSON, JEFFREY LAURIE JR.,
REBECCA OUBECK, MICHAEL HILLEY,
RUTH SHOUPE, STANLEY SULLIVAN,
KAREN ASCENCIO, BEN THORSEN, RENTAL
MAUDLIN, MICHAEL J. OUELLETTE,
NANCY SIMMONS, TUTTLE FAMILY,
ROLLIN TUTTLE, JR., TERRI GARIEPY,
DAVID LADOMER, MICHAEL HAYENS,
KELLY CARUSS, DEBRA SOOP, GARY
POPIELA, MARIAL MENDELSON,
CLEMENCE FADEL, ROSE SHAYA, TED
MARCH, ANTHONY FONTAN, ERICA

UNPUBLISHED
January 30, 2020

No. 347044
Oakland Circuit Court
LC No. 2017-158234-CH

FLANIGAN, DONNA FUGA, MATTHEW
KURILIK, COURTNEY KURILIK, STACEY
MEDEN, CHRIS DUNN, CHRISTOPHER
POSTEMA, DANIEL CODGES, ARNOLD
FISHER, LORRAINE FISHER, CHARLIE
GATT, SHERYL GATT, NEW CHAPTER
HOMES, KOPY LUCAK, BRIAN HILFINGER,
LAURA VAUGHN, PALMA WEAVER,
GLENDA A. HAMILTON, THELMA NAPIER,
RAYMOND HOYER, CITY OF NOVI, and
LINDA POSTMA,

         Defendants.

Before: METER, P.J., and FORT HOOD and REDFORD, JJ.

PER CURIAM.

Defendants appeal by right the trial court's order denying their motion for summary disposition and granting plaintiffs' request for summary disposition pursuant to MCR 2.116(I)(2). The trial court ordered that the restrictive covenants governing the Idlemere Park Subdivision in Novi, Michigan only allow non-lakefront lot owners to access Walled Lake via outlots to engage in water-related activities but do not allow them to moor boats or other watercraft overnight, seasonally, or permanently at docks at three outlots. For the reasons stated herein, we reverse and remand for further proceedings.

## I. FACTUAL BACKGROUND

The Idlemere Park Land Co. platted the Idlemere Park Subdivision and recorded in the Oakland County Register of Deeds the approved plat map on April 17, 1917. The subdivision plat map featured a road called Lakeside Drive that ran along the lakeshore separating developable residential lots from four elongated lakeside lots designated as Lots 141, 142, 143, and 144. Several subdivision roads intersected with and terminated at Lakeside Drive. On August 10, 1922, George and Anna Weitzel conveyed lots within the subdivision subject to restrictive covenants that ran with the land. In December 1932, the Novi Township Board approved the replatting and subdivision of Lots 142, 143, and 144, pursuant to "Supervisors Replat of Lots 142, 143 and 144 of Idlemere Park" which created additional lots along the lakeshore adjacent to Lakeside Drive on former Lots 142, 143, 144. The replatted lots not only created lakefront lots but also Outlots A through G located on Lakeside Drive where Elmwood Drive, Lilac Walk, Maplewood Drive, Lakewood Drive, Beechwood Drive, Oakwood Drive, and Willow Walk intersected and terminated at Lakeside Drive. Outlot F is the lakefront lot located where Beechwood Drive intersected with Lakeside Drive.

On August 7, 1985, plaintiffs acquired Lot 91 and the east 40.3 feet of Lots 92 and 93, plus Lot 24 of the Idlemere Park Subdivision, subject to easements and restrictions of record. Lot 24 is lakefront property that lies adjacent to and borders on the west of Outlot F which is

located on South Lake Drive, formerly known as Lakeside Drive, where Beechwood Drive, now known as Bernstadt Street, intersects it. At various times, defendants acquired their lots within the subdivision similarly subject to the restrictive covenants and easements of record. Defendants' lots do not have frontage on the lake. During 2015, defendants Michael J. Link and Leanne M. H. Link, his wife, Wesley Leckenby, Terry Osmun and his wife, Daphne Smith, erected and used a dock for mooring boats at Outlot F. They also used Outlot F for sunbathing, picnics, bonfires, and other activities. Plaintiffs hired an attorney who sent a letter demanding that these defendants stop using Outlot F for any purpose and removal of the dock. These defendants responded by explaining that restrictive covenants permitted their activities. After sending them another letter which did not result in the desired response, plaintiffs sued the Links, Leckenby, Osmun, and Smith for a declaratory judgment that their activities violated MCL 324.30111b of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq*. and for injunctive relief. These defendants denied the allegations of wrongdoing and any liability to plaintiffs and countersued for among other things declaratory and injunctive relief.[1]

The Links, Leckenby, Osmun, and Smith moved for summary disposition under MCR 2.116(C)(8) and (10) on the grounds that recorded restrictive covenants applicable to the Idlemere Park Subdivision reserved seven lakefront outlots for the use and enjoyment of the subdivision's lot owners who did not have frontage on the lakeshore. They admitted that they installed a dock and used Outlot F for activities unrelated to the water but asserted that they had the right to do so under the restrictive covenants which they argued granted them riparian rights. Plaintiffs opposed the motion. They conceded that restrictive covenants granted defendants an easement to access the lake and to erect a dock, but they argued that defendants' rights were very limited. The trial court agreed with plaintiffs' interpretation of the restrictive covenants and ruled that defendants had an easement of access to the lake for water-related activities only and that they were permitted to erect docks at specified outlots for daily use but not for seasonal or overnight mooring of watercraft.

## II. STANDARDS OF REVIEW

"Where a motion for summary disposition is brought under both MCR 2.116(C)(8) and (C)(10), but the parties and trial court relied on matters outside the pleadings, as is the case here, MCR 2.116(C)(10) is the appropriate basis for review." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008) (citation omitted). We review de novo a trial court's decision on a motion for summary disposition. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5-6; 890 NW2d 344 (2016). We also review "de novo a trial court's decision on a motion for summary disposition in an action for a declaratory judgment." *Lansing Sch Ed Ass'n v Lansing*

---

[1] The trial court later ordered plaintiffs to file an amended complaint to join all backlot owners within the subdivision because their rights would be affected by the court's rulings in this case. After requests by plaintiffs to reverse or amend that order, plaintiffs filed an amended complaint adding approximately 60 additional defendants some of whom were dismissed upon stipulation by the parties.

*Bd of Ed (On Remand)*, 293 Mich App 506, 512-513; 810 NW2d 95 (2011). A motion for summary disposition under MCR 2.116(C)(10) challenges the "factual adequacy of a complaint on the basis of the entire record, including affidavits, depositions, admissions, or other documentary evidence." *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 115; 839 NW2d 223 (2013). A trial court's grant of summary disposition under MCR 2.116(C)(10) is proper when the evidence, "viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law." *Lowrey*, 500 Mich at 5. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Gorman*, 302 Mich App at 116 (citation omitted). "The trial court appropriately grants summary disposition to the opposing party under MCR 2.116(I)(2) when it appears to the court that the opposing party, rather than the moving party, is entitled to judgment as a matter of law." *Sherry v East Suburban Football League*, 292 Mich App 23, 34; 807 NW2d 859 (2011) (quotation marks and citation omitted).

Issues of contract interpretation are also reviewed de novo. *DaimlerChrysler Corp v Wesco Distrib*, 281 Mich App 240, 244; 760 NW2d 828 (2008). "The interpretation of restrictive covenants is a question of law that this Court reviews de novo." *Eager v Peasley*, 322 Mich App 174, 179; 911 NW2d 470 (2017) (quotation marks and citation omitted). "The scope and extent of an easement is generally a question of fact that is reviewed for clear error on appeal." *Morse v Colitti*, 317 Mich App 526, 534; 896 NW2d 15 (2016) (quotation marks and citation omitted). A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made. *Id*.

### III. ANALYSIS

This case requires determination of the rights granted to backlot owners in the restrictive covenants applicable to the Idlemere Park Subdivision, including the scope of the easement provision, whether the restrictive covenants conveyed to them riparian rights relating to Walled Lake, and the scope of the dock provision, whether it permits mooring of watercraft seasonally or overnight. "A covenant is a contract created with the intention of enhancing the value of property and is a valuable property right." *The Mable Cleary Trust v The Edward-Marlah Muzyl Trust*, 262 Mich App 485, 491; 686 NW2d 770 (2004). Public policy grounded in Michigan's common law supports property owners' rights to create and enforce covenants affecting their own property. *Terrien v Zwit*, 467 Mich 56, 70-71; 648 NW2d 602 (2002). Such covenants "are to be read as a whole to give effect to the ascertainable intent of the drafter." *Mable Cleary Trust*, 262 Mich App at 505.

In *Mazzola v Deeplands Development Co, LLC*, ___ Mich App ___; ___ NW2d ___ (2019); slip op at 4-5, this Court recently explained:

> Restrictive covenants involve two fundamental freedoms—the freedom to contract and the freedom to use property. In the context of restrictive covenants, a tension between the two can sometimes arise. The covenants are contracts pertaining to real property that Michigan courts perceive as having particular value. Because of this Court's regard for parties' freedom to contract, we have consistently supported the right of property owners to create and enforce

-4-

covenants affecting their own property. At the same time, by their very nature, restrictive covenants can also negatively impact the free use of property.

Accordingly, courts must apply unambiguous restrictive covenants as-written unless the restriction contravenes law or public policy, or has been waived by acquiescence to prior violations. The general rule with regard to interpretation of restrictive covenants is that where no ambiguity is present, it is improper to enlarge or extend the meaning by judicial interpretation. Restrictive covenants are construed strictly against those claiming the right to enforce them, and all doubts are resolved in favor of the free use of property. Our Supreme Court has referred to this latter principle as fundamental, and it has noted that courts must not infer restrictions that are not expressly provided in the controlling documents. [Quotation marks, citations, and alteration omitted.]

Restrictive covenants provide valuable property rights which courts balance against the principle against the restriction of free use of property. *Conlin v Upton*, 313 Mich App 243, 256; 881 NW2d 511 (2015). "When construing a restrictive covenant, courts may only give it a fair construction; courts may not broaden or limit the restriction." *Id*. (citation omitted). A relevant term in a contract that is undefined is interpreted in accordance with its commonly used meaning. *Bloomfield Estates Improvement Ass'n, Inc, v City of Birmingham*, 479 Mich 206, 215; 737 NW2d 670 (2007). A contract is ambiguous when a term is equally susceptible to more than a single meaning. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007). Language in a legal instrument that dedicates land for the use of others generally constitutes the "grant of an easement, not a grant of fee ownership." *Colitti*, 317 Mich App at 534 (citation omitted).

"Land that includes or is bounded by water is defined as riparian." *Id*. at 536.[2] "Further, '[a] 'riparian proprietor' is a person who is in possession of riparian lands or who owns an estate therein.' " *Little v Kin*, 249 Mich App 502, 508; 644 NW2d 375 (2002) (Little I). "Owners of riparian land enjoy certain exclusive rights, including the rights to erect and maintain docks and to permanently anchor boats off the shore." *Colitti*, 317 Mich App at 534, citing *2000 Baum Family Trust*, 488 Mich at 166; see also *Holton v Ward*, 303 Mich App 718, 725; 847 NW2d 1 (2014). Riparian rights are property. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 191; 521 NW2d 499 (1994). Riparian owners of an inland lake own the bottomland from the shore to the middle of the lake. *Putnam v Kinney*, 248 Mich 410, 412; 227 NW 741 (1929). "[W]here there are several riparian owners on an inland lake, they may use the surface of the whole lake for boating, swimming, fishing, and other similar riparian rights, as long as they do

---

[2] In *Little v Kin*, 249 Mich App 502, 504 n 2; 644 NW2d 375 (2002), this Court noted that:

Our Supreme Court observed in *Thies v Howland*, 424 Mich 282, 288 n 2; 380 NW2d 463 (1985), that, "[s]trictly speaking, land which includes or abuts a river is defined as riparian, while land which includes or abuts a lake is defined as littoral." However, as in *Thies*, "the term 'riparian' is often used to describe both types of land and will be so used in this opinion." *Id*. at 288, n 2.

not interfere with the reasonable use of the waters by other riparian owners." *West Mich Dock & Market Corp v Lakeland Investments*, 210 Mich App 505, 512-513; 534 NW2d 212 (1995).

"Nonriparian owners and members of the public who gain access to a navigable waterbody have a right to use the surface of the water in a reasonable manner for such activities as boating, fishing and swimming. An incident of the public's right of navigation is the right to anchor boats temporarily." *Dyball v Lennox*, 260 Mich App 698, 707-708; 680 NW2d 522 (2004). "[W]hile full riparian rights and ownership may not be severed from riparian land and transferred to nonriparian backlot owners, Michigan law clearly allows the original owner of riparian property to grant an easement to backlot owners to enjoy certain rights that are traditionally regarded as exclusively riparian." *Id*. at 706 (alteration in original). "Reservation of a right of way for access does not give rise to riparian rights, but only a right of way." *Id*. If an easement providing access to the lake exists, the language of the easement determines whether the easement holder has been granted any riparian rights. *Id*. at 708. "If the text of the easement is ambiguous, extrinsic evidence may be considered by the trial court in order to determine the scope of the easement." *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749 (2003) (Little II).

In *Little I*, 249 Mich App at 513-514, this Court explained:

While Michigan law does not permit the severance and transfer of riparian ownership or riparian rights normally enjoyed exclusively by owners of riparian land, it clearly allows a grantor to confer to nonriparian backlot owners an easement to enjoy such rights. Further, our courts have made clear that such a grant is not to be assumed; rather, a court must determine the scope of the nonriparian owners' rights as a question of fact, by examining the language of the easement and the surrounding circumstances at the time of the grant. Further, in determining these rights, the court must consider whether the use would unreasonably interfere with the riparian lot owners' use and enjoyment of their property.

The Idlemere Park Subdivision lots are subject to restrictive covenants which in relevant part provide:

This property is sold subject to the following restrictions which run with the land made for the benefit of all owners of lots one (1) to One Hundred Forty-Six (146) inclusive.

* * *

This contract is made by said first party and accepted by said second party with the express understanding and agreement that no building of any character shall ever be erected on Lots 142, 143, 144 of said Subdivision, said lots being on the north side of the lake highway and fronting Walled Lake.

* * *

-6-

Further that the purchasers of all lots in said subdivision other than the lots fronting on lake road shall have a perpetual right of way or easement over and across the lake those parts of Lots 142, 143, 144, immediately in front of and in line with Elmwood Drive, Lilac Walk, Maplewood Drive, Lakewood Drive, Beechwood Drive, Oakwood Drive, and Willow Walk, to Walled Lake.

\* \* \*

Further that all purchasers of lots other than those carrying individual lake frontage shall give their best efforts and aid in keeping their portion of Lots 142, 143, 144 over which the perpetual right of way and easement in the lake is granted in a clean orderly condition and free from papers, rubbish and other debris.

\* \* \*

It is further mutually agreed between the parties of this contract, that the first party is to build at the end of Beechwood Drive, Maplewood Drive and Elmwood Drive of said subdivision, docks to be used by said second parties. In consideration of the building of said docks the said second parties agree to maintain the same and keep said docks in proper repair at their own expense. Said second parties further agree to relieve first party of all liability by reason of failure to keep said docks in proper repair or by reason of improperly maintaining same.

First parties agree to cut weeds and rushes along lake shore line and second parties agree to keep said weeds and rushes cut and become responsible for the appearance of said shore line from this date.

These restrictive covenants indicate that they apply to all owners of Lots 1-146 in the original platted subdivision. The documents submitted to the trial court by the parties, including copies of indentures recorded in the record title of properties within the Idlemere Park Subdivision, state that the restrictive covenants arose by contract between the parties' predecessors in interest and the Weitzels who conveyed ownership interests to them. The restrictive covenants prohibit erection of buildings on Lots 142, 143, and 144, which according to the original plat, consisted of elongated lakefront lots bounded by Lakeside Drive to the south and Walled Lake's lakeshore to the north. When Lots 142, 143, and 144 were replatted in 1932, the three lots were subdivided into 29 lots, plus seven outlots designated Outlots A through G, and an approximately 100-foot excepted piece of lakefront property.

One of the paragraphs of the restrictive covenants grants an easement. The purchasers of lots not "fronting on lake road," i.e., the backlot owners, were granted a perpetual right-of-way easement for access to Walled Lake via portions of the original platted Lots 142, 143, and 144 at the juncture of five roads and two walks with Lakeside Drive. The purchasers of "lots fronting on lake road," however, were expressly excluded from and not granted any easement rights respecting the land dedicated for the backlot owners' right-of-way easement for access to the lake.

The extent of a party's rights under an easement is a question of fact that this Court reviews for clear error. *Blackhawk Dev Corp v Dexter Village*, 473 Mich 33, 40; 700 NW2d 364 (2005); *Little v Kin*, 249 Mich App at 507. The record reflects that plaintiffs own Lot 91 which fronts the lake road, and they also own Lot 24, a replatted portion of Lot 142, which has approximately 40 feet of frontage on Walled Lake. Under the restrictive covenants, plaintiffs do not have rights in the outlots, the land granted to backlot owners for a perpetual right-of-way easement. This paragraph does not grant to plaintiffs any rights to use or alter the land subject to the easement, nor any right to interfere with other subdivision property owners' rights to access the lake and use it at the specified outlot locations.

Defendants, all backlot owners, are beneficiaries of the right-of-way easement to the lake via the seven outlots. The easement provision does not grant backlot owners a fee ownership interest in the outlots. The restrictive covenants dedicated the portions of Lots 142, 143, and 144 as communal property to remain part of the subdivision.

If one reads the language of the easement provision to the exclusion of other restrictive covenant provisions, one could conclude that the easement granted backlot owners only the limited rights as plaintiffs argue. The easement provision, however, must be read within the context of the other restrictive covenants' provisions and "as a whole to give effect to the ascertainable intent of the drafter." *Mable Cleary Trust*, 262 Mich App at 505. Although the easement provision does not grant defendants unfettered rights to use the outlots' land as extensions of their own lots, we find that when read in context with other restrictive covenant provisions, the intent of the grantor respecting the extent of rights granted to backlot owners under the restrictive covenants does not clearly limit defendants' rights.

For example, the next relevant paragraph of the restrictive covenants imposes upon the purchasers of land "other than those carrying individual lake frontage" the obligation to maintain in a clean and orderly fashion the land dedicated as a perpetual right-of-way easement to the lake. This provision, read in relation to the other provisions, indicates that the maintenance obligation requires both the owners of lots fronting the lake road and the backlot owners to maintain the lots that serve as a perpetual right-of-way easement to the lake for backlot owners. This provision, however, does not permit alteration of the outlots by either those with lots fronting on lake road or backlot owners.

Further, the next paragraph of the restrictive covenants relevant to the issues at bar specifies that the grantor promised to build docks "at the end of Beechwood Drive, Maplewood Drive and Elmwood Drive of the subdivision," three of the easement for access locations, for use by the "second parties." On the replat map, these locations are identified as Outlot F, Outlot C, and Outlot A. The docks at these locations were dedicated for the use by "said second parties." The "second parties" to the restrictive covenants contract were all purchasers of lots within the subdivision, plaintiffs' and defendants' predecessors in interest. The language of the dock provision, therefore, indicates that the grantor intended that all subdivision lot owners could use the docks as communal property. In consideration for their use of the docks, the subdivision lot owners agreed to maintain the docks and waived and released the grantor of all liability for maintaining the docks.

Absent from the restrictive covenants' dock provision, however, is any description of the scope of permissible uses that subdivision lot owners may make of the docks. The provision does not differentiate between riparian and nonriparian lot owners. It does not specify what owners may do at the docks. The dock provision does not distinguish lot owners' respective rights based on the type of lots they own. The provision also makes no mention of any limitation of the docks' use and does not specifically articulate anything regarding mooring of boats. Our Supreme Court has often explained that restrictive covenants "are construed strictly against grantors and those claiming the right to enforce them, and all doubts are resolved in favor of the free use of property." *O'Connor v Resort Custom Builders, Inc*, 459 Mich 335, 341-342; 591 NW2d 216 (1999), quoting *Wood v Blancke*, 304 Mich 283, 287; 8 NW2d 67 (1943), citing *James v Irvine*, 141 Mich 376; 104 NW 631 (1905).

Under the strict construction doctrine articulated in *O'Connor* regarding the undefined scope of the docks' permitted uses by all lot owners, the dock provision could be interpreted as having granted all lot owners within the Idlemere Park Subdivision the right to use the docks at Outlots A, C, and F, freely without restriction. In *Thies*, 424 Mich at 288 (citations omitted), our Supreme Court explained that persons who:

> have a possessory interest in riparian land enjoy certain rights. These include the right to erect and maintain docks along the owner's shore, and the right to anchor boats permanently off the owner's shore. Nonriparian owners and members of the public who gain access to a navigable waterbody have a right to use the surface of the water in a reasonable manner for such activities as boating, fishing and swimming. An incident of the public's right of navigation is the right to anchor boats temporarily.

The restrictive covenants' dock provision in this case granted rights beyond the rights ordinarily incident to the public's limited use of bodies of navigable waters. Further, the rights granted exceed those provided by the easement provision granted to backlot owners. The dock provision separately and distinctly granted to all lot owners within the subdivision the right to communally possess, maintain, and use the docks, rights typically reserved to riparian owners. *Id*. at 294. "Erecting or maintaining a dock near the water's edge is a riparian or littoral right." *Dyball*, 260 Mich App at 705. The restrictive covenants' dock provision in this case neither expressly permits nor prohibits seasonal or overnight mooring of boats at the docks by lot owners, whether they own riparian or nonriparian lots.

Because the restrictive covenants leave undefined the scope of permissible use by all lot owners without regard for the types of lots they own, the dock provision appears susceptible to more than one reasonable interpretation. Reading the restrictive covenants together and harmonizing the language of the covenants does not shed light on the scope of the docks' permitted usage by all lot owners. The dock provision, on its face, lacks clarity regarding the scope of permitted usage of the docks by subdivision lot owners. Analysis of the language used in the dock provision in accordance with the words' commonly used meanings provides no clarity. Dictionaries define the noun "dock" as a "wooden pier used as a landing place or moorage for boats," *Merriam-Webster's Collegiate Dictionary* (11th ed), or a "structure that encloses water, often between two piers, in which ships are received for loading, unloading,

safekeeping, or repair." *Black's Law Dictionary* (11th ed). Obviously, a dock may serve for daily use, temporary use, or seasonal and overnight mooring of boats.

The contractual provision providing "docks to be used by said second parties" is susceptible to more than one reasonable interpretation regarding the scope of their permissible uses depending on how one reads the language used by the grantor. If one focuses on the fact that the dock provision does not state any restrictions on uses, one could reasonably interpret it to permit all lot owners to exercise full riparian rights respecting the docks' use including seasonal and overnight mooring of boats by all lot owners. If, however, one focuses on the fact that the dock provision does not expressly state that backlot owners are granted full riparian rights respecting the docks' usage, one could reasonably interpret it to not permit all lot owners to exercise full riparian rights respecting the docks.

Plaintiffs argue essentially that the easement provision must be read literally and that it controls how the dock provision may be interpreted. Plaintiffs, however, fail to discuss the dock provision itself or address the rights provided to all lot owners under it. They assert that, because the easement provision only provides defendants access to the lake, backlot owners have no right to exercise typical riparian rights respecting the docks. They likewise posit that backlot owners without land bordering on the lake, as nonriparian landowners, are relegated to daily use of the docks only and use of the lake with no more rights than members of the public who access a body of water. Defendants, on the other hand, primarily look to the dock provision to establish their rights. They argue that, because the dock provision grants them the right to erect, maintain, and use docks at the designated outlots, they have been granted riparian rights since only riparian owners have the right to erect, maintain, and use docks. Defendants contend that the dock provision must be interpreted to grant them typical riparian rights including seasonal and overnight mooring of boats. They assert that the definition of a dock as a place for mooring boats must be recognized as the foundation principle inherent in the dock provision's grant of rights to backlot owners. In essence, they contend that, because the dock provision granted them the right to erect, maintain, and use docks at the designated outlots, the provision permits their exercise of all rights typically held by owners or possessors of riparian land, including mooring watercraft seasonally and overnight at the dock at Outlot F.

Plaintiffs' argument is alluring, but because they do not consider or address the scope of rights granted under the dock provision or consider the dock provision in the context of the various rights granted by the other restrictive covenants' provisions, it fails and cannot suffice to establish the grantor's intent regarding the scope of permissible uses of the docks at the designated outlots by subdivision lot owners. By contrast, defendants focus on the right to maintain and use the dock and the full breadth of the uses that persons make of docks. Defendants' reliance on the dock provision in conjunction with the easement provision merits greater consideration, but it too fails to establish the grantor's intent regarding the scope of permissible uses of the docks at the designated outlots by subdivision lot owners.

None of the parties appears to consider that the dock provision applies to all lot owners and not merely the backlot owners. Nor do they address the fact that the dock provision neither expressly permits nor prohibits the type of use defendants seek to make of the docks at the designated outlots. Both sides fail to establish what the intent of the grantor was at the time of the drafting of the restrictive covenants. The lack of specificity regarding the scope of use the

grantor intended when drafting the dock provision makes the provision susceptible to more than one meaning. The dock provision, therefore, is ambiguous. Because the dock provision is ambiguous respecting the scope of its use, extrinsic evidence may be considered to determine the grantor's intent. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469-472; 663 NW2d 447 (2003).

Moreover, none of the parties has considered the provision in the restrictive covenants that provides that "second parties agree to keep said weeds and rushes cut and become responsible for the appearance of said shore line from this date." In this provision, the grantor initially agreed to cut the weeds and rushes along the lakeshore but shifted that obligation to all lot owners within the subdivision. The right to act respecting the lakeshore and bottomlands near the shore are rights of riparian ownership. The imposition of such an obligation on backlot owners requires consideration because it implicitly suggests that the grantor conceived of its grant of rights to backlot owners as more than mere access to the lake for use of the surface like the public's access and use of a body of water. The grantor making such work the obligation of backlot owners, as well as, lakefront lot owners and owners of lots fronting the lake drive, suggests that the grantor intended for backlot owners to share in the rights and obligations akin to those held by riparian owners. Reading the easement provision, the outlot maintenance provision, the dock provision, and the shoreline maintenance provision together, the scope of the rights granted to defendants by the grantor via the restrictive covenants appears less restrictive than the trial court ruled and certainly not as severely limited as plaintiffs contend. The shoreline maintenance provision exposes another provision of the restrictive covenants susceptible to more than one reasonable interpretation.

Whether a common understanding of the scope of the docks' permitted usage by all lot owners existed historically cannot be determined based upon the record presented in this case. The parties did not submit for the trial court's consideration any historical documentation that sheds light on the grantor's intent regarding the scope of the use of the dock by the Idlemere Park Subdivision lot owners. Further, the record does not reflect the lot owners' historical understanding of the grantor's intent in that regard.

The record also does not indicate lot owners' conduct during the almost 100 years of the subdivision's existence and the creation of the restrictive covenants that run with the land respecting use of the docks at the specified outlots by lot owners. Defendants submitted one joint affidavit to the trial court in support of their summary disposition motion combining the sworn testimonies of Michael Link, Leanne Link, Osmun, and Smith, regarding facts pertaining to the outlots' use and the historical use of the dock at Outlot F. They attested that other residents moored boats at Outlot F and had done so for decades. They also averred that other subdivision neighbors kept docks and moored boats at the other outlots for decades without any issues. In response to defendants' summary disposition motion, plaintiffs submitted their own joint affidavit in which they averred that a dock never existed at Outlot F until 2015. The parties did not submit documentary or other evidence that corroborated their affidavit testimonies. The parties did not depose any witnesses and subject them to cross-examination regarding the grantor's intent or the docks' historical use by lot owners. Their respective affidavit testimonies contradict each other and, at the very least, presented a genuine issue of material fact regarding the historical use of Outlot F and the other outlots.

Because the restrictive covenants' provisions, when read together fail to clarify the scope of the easement and dock provisions, extrinsic evidence should have been considered by the trial court to determine the grantor's intent. *Klapp*, 468 Mich at 469-472. The record before us lacks evidence to clarify the grantor's intent regarding the scope of the rights granted to backlot owners under the restrictive covenants. Close analysis of the restrictive covenants' provisions does not support the trial court's interpretation that they unequivocally restricted defendants' rights respecting the outlots and the docks at the three specified locations. Therefore, we reverse the trial court's rulings and remand for further proceedings.

On remand, the trial court should determine the scope of defendants' rights under the restrictive covenants by taking into consideration the individual provisions in conjunction with and in the context of the other provisions and also look outside the four corners of the restrictive covenants to examine extrinsic evidence to determine the intent of the drafter and grantor in this regard. The trial court should consider evidence of the historical use of the outlots and docks by subdivision lot owners. The trial court must bear in mind that restrictive covenants "are construed strictly against grantors and those claiming the right to enforce them, and all doubts are resolved in favor of the free use of property." *O'Connor*, 459 Mich at 341-342. The trial court must examine the language of the easement and the surrounding circumstances at the time of the grant and consider whether the use would unreasonably interfere with the riparian lot owners' use and enjoyment of their property. *Little I*, 249 Mich App at 513-514 This Court has previously reversed and remanded for such further proceedings in *Little I*. *Id*. at 514-515. Our Supreme Court agreed with this Court's judgment and similarly instructed the trial court. *Little II*, 468 Mich at 700-701.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Patrick M. Meter
/s/ Karen M. Fort Hood
/s/ James Robert Redford

-12-