*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KEVIN CHRESTON, HOLLY CHRESTON,
RICHARD MOODY, MARY MOODY, and
ROBERT HAGGERTY,

UNPUBLISHED
September 1, 2022

Plaintiffs-Appellants,

and

KEITH CHRESTON, STEVE MOODY, ANNA
MOODY, MURRAY MCNEILL, and BEVERLY
MCNEILL,

Plaintiffs,

v

No. 356448
St. Clair Circuit Court
LC No. 19-002566-CZ

LAKE HURON MANOR ASSOCIATION, INC.,

Defendant-Appellee.

Before: RIORDAN, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

In this property dispute, plaintiffs[1] appeal as of right the trial court's judgment following a bench trial. The trial court concluded in relevant part that defendant did not violate the applicable deed restrictions, violate the applicable by-laws, or obstruct plaintiffs' view of Lake Huron by installing a new swing set and planting a new tree in the beach park ("the Park"), which was located

---

[1] For purposes of this opinion, we refer to plaintiffs-appellants collectively as "plaintiffs." We recognize that there were other plaintiffs involved in the trial court who are not parties to this appeal. Our use of the term "plaintiffs" should not be understood to refer to plaintiffs who are not parties on appeal unless specifically stated otherwise.

-1-

on the shore of Lake Huron and designated for the common use of owners of lots in the subdivision. For the reasons set forth in this opinion, we affirm.

## I.  BACKGROUND

Plaintiffs are owners of property in a platted subdivision called Lake Huron Manor, located in Fort Gratiot Township, Michigan.  Defendant is the homeowners' association, consisting of Lake Huron Manor property owners, which maintains the subdivision's common-use areas such as the Park.  According to the plat, the eastern side of the Park[2] is situated along Lake Huron.  The Park is bordered by Elmwood Drive on the north, Manor Drive on the west, and Maplewood Drive on the south.  The lots along the north, west, and south sides of the Park are separated from the Park by these roads.

At issue in this case is a specific restriction that evidently was contained in the deeds for all of the lots in the subdivision.  Defendant's bylaws had also specifically incorporated this restrictive covenant.  The deed restriction provided as follows:

> Together with the right to use and enjoy in common with other grantees and persons who shall become lot owners in said plat as grantees of the parties of the first part, their heirs and assigns, all land lying between the platted portion of said Lake Huron Manor Plat and the meander line of Lake Huron, which use and enjoyment by said second party and the other grantees and persons shall be limited to such use as is usual for residents and visitors at a family summer resort to make of a beach in connection with such resort.  Together with all and singular the hereditaments and appurtenances [thereunto] belonging or in anywise appertaining.
>
> There is established a general plan of restrictions to apply to all lots numbered from one to one hundred and twenty, both inclusive, only, of said Lake Huron Manor Plat.  The lands herein conveyed are part of said Lake Huron Manor Plat and it is understood and agreed that the lands herein conveyed shall be subject to and conditioned upon the following restrictions and reservations:
>
> * * *
>
> (h) No building, tent, or other structure of any kind or nature (except Community flag pole) whether permanent or temporary shall be erected or maintained on that portion of land lying between the platted lots and the waters of Lake Huron, nor shall any vehicle park thereon, nor shall anything be placed thereon that shall obstruct the lot owners' view of the lake.

---

[2] This area is designated as "Beach" on the Plat.  The record indicates that this area includes both a sandy beach area next to the water and a grass and tree covered park area extending to its western boundary.

In August 2019, there was a meeting of defendant's board of directors at which the board discussed planting a new tree and replacing an old swing set in the Park. According to board president Sue Mogle, a memorial tree planted several years earlier had died and another diseased tree had been removed. Mogle believed that the discussion at the board meeting involved replacing the memorial tree. In response to the board's plan, plaintiff Holly Chreston objected to planting any new trees in the Park. Holly[3] and her husband, Kevin Chreston, lived on Manor Drive, and the front of their house faced the Park. From their house, looking directly across the Park, Lake Huron was visible.

Later that fall, a red rocket maple tree was planted in the Park and a new swing set was installed in the Park. Holly claimed that the tree blocked her view and that her view would become worse as the tree grew. The Park previously contained two swing sets and a play structure that included a slide and three swings. The play structure and one swing set were removed approximately a few weeks before the new swing set was installed. The other swing set had been removed earlier during the course of a storm drain project. Holly claimed that the new swing set was bigger than the old swing set.

Plaintiffs subsequently initiated this action. As relevant to the issues presented on appeal, plaintiffs alleged that defendant had violated the restrictive covenants and bylaws by planting the new tree and installing the new swing set in the park. Plaintiffs sought a declaratory judgment, a permanent injunction prohibiting defendant from planting trees or installing structures other than a flag pole in the Park, and an order requiring defendant to remove the swing set and new tree.

At the bench trial, there was testimony that the two swing sets and play structure had been in the Park for decades. Holly admitted that there were three swing sets in the Park when she moved into her house in 2004: on the south side of the Park, there was a metal swing set with two swings. On the north side of the Park, there was an identical metal swing set, as well as a play structure made of wood that had three swings and a slide. Plaintiff Mary Moody had lived in the development with her husband, Richard Moody, since 1967. They currently lived on Manor Drive next to the Chrestons but had previously lived in a different house within the development and near the Park. Mary[4] testified that in 1967, there was a swing set at north end of the Park and a swing set at the south end of the Park. There was also testimony that the old metal swing set in front of the Chreston's was installed at some point after 1978. Plaintiff Robert Haggerty owned a residence on Elmwood. His parents had originally bought the property in 1967 when he was three years old, and he "grew up" there. Haggerty testified that the wood play structure had been in the Park "since the mid '90s." He indicated that there had been different pieces of playground equipment in the Park over time.

According to Holly, the swing set on the south side of the Park was removed in 2016 during the course of a storm drain project, and the swing set and play structure were removed from the north side of the Park in late August and early September 2019. The new swing set was installed

[3] Because there are multiple plaintiffs that share the same last name, we refer to them individually by first name.

[4] Because multiple plaintiffs share the same last name, we refer to them individually by first name.

-3-

during September and October 2019. The record evidence indicates that the new swing set was installed on the north side of the Park, in the same general vicinity as the two swing sets that were previously located on the north side of the Park. Holly claimed that the new swing set was not in the exact same location as the old swing set, but Mogle testified that the new swing set was installed "in the same holes as the other one." There were four swings and a slide on the new swing set.

Holly testified that the new swing set is taller, wider, and longer than the previous set. Kevin agreed that the new swing set was larger and obstructed more of his view than the old swing sets. Haggerty and Mary also agreed that the new swing set was larger. Haggerty testified, however, that he did not "really . . . object to the, to the swing sets" because there had "always been swing sets there" and "replacing them in basically the same spot doesn't affect me." Mary testified that she only objected to the placement of the new swing set on the north side of the Park because it blocked her view. She would not have been opposed to putting the swing set on the south side of the park. Mogle believed that the new swing set was not bigger than the old one; she also thought the view had been improved by replacing three swing sets with one.

There was also testimony that the Park had historically included trees for decades and that there were currently approximately 15 to 20 trees in the Park. There was also testimony that some trees had been lost to storm damage or disease over time. Mary testified that there were trees in the Park in 1967. Holly had objected when the memorial tree was planted in 2013, although it was not in her direct view of the water. Holly and Kevin each testified that the new tree that was planted in 2019 blocked their view of Lake Huron from their house and that their view would become worse as the tree grew. Mary also testified that the new tree planted in 2019 blocked the view of the water from her house.

Following the trial, the trial court entered its judgment indicating in relevant part (1) that "[i]nstallation of the new swing set in the Park is not a violation of the deed restrictions and/or by-laws and is not an obstruction that blocks the lot owners' view of the lake," and (2) that "planting of the new tree in the Park is not a violation of the deed restrictions and/or by-laws." With respect to planting trees, the trial court further ruled: "This is not to say Defendant has unfettered discretion to plant as many trees as it would like because depending on the number of new trees, the location, the type, and the mature size an obstruction could exist. An alleged violation of a deed restriction is a fact driven question to be decided on a case-by-case basis."

The trial court thoroughly explained its reasoning in a written opinion. Regarding the swing set and tree, the trial court reasoned:

It is not disputed that the swing set qualifies as a structure on the park property. As such, its placement and continued existence is properly within the scope of the subsection (h) of the deed restrictions that prohibits structures being erected in the park, unless the alleged violation has been waived. It was undisputed that two swing sets and a playscape type structure existed in the park for many years without objection. Those items were in the park when the Chrestons and the Moodys bought their residences. While Plaintiffs acknowledge they have acquiesced, legally, to the presence of the old swings they claim the new swing set is a more serious violation because it is taller and longer than the old swing set, is

-4-

not in the same location and contains more swings than the old swing set. This Court disagrees.

The testimony at trial confirmed that at least one of the legs of the new swing set is in the same location as one of the legs from the old swing set. Because the dimensions of the new set do not match the old it cannot be located in the exact same place. That being said, the new swing set is substantially in the same location as the old one.

The photographs admitted as exhibits show the old swing set contained two regular swings and a baby swing, and the nearby playscape contained two swings and a slide attached to a wooden climbing structure. The swing set formerly at the south end of the property had two swings. The new swing set has three regular swings, a slide and a baby swing. The end result is that the new swing set contains fewer swings in a single structure than the three prior structures combined and has resulted in two less structures in the park. The height and the width of the new swing set is de minimis in the court's view. The support tubing for the new swing set appears to be smaller in diameter than the old tubing with an equal number of legs and a single top section. Rather than constitute a more serious violation regarding the presence of structures in the park, the new swing set is less conspicuous, has fewer swings, has a smaller foot print than the three prior structures and has resulted in more open space for use by LHM residents. Rather than constitute a more serious violation as Plaintiffs claim, the new swing set is a less serious violation, assuming it is a violation at all because of the resort like theme intended by the developers.

The prohibition of structures being placed on the park property was likely intended as part of the overall theme to maintain the park as an open space for traditional park purposes. Oblique structures such as tents or buildings are likely to obstruct the "owners' view of the lake." It can be argued that a swing set is not the kind of structure contemplated by the developers in the first part of the deed restriction because you can see through it and they are commonly found at a beach front resort. However, the deed restriction also prohibits the placing of anything else on the park property that obstructs the "owners' view of the lake." Plaintiffs, specifically the Chrestons and the Moodys, are claiming the new swing set obstructs their view of the lake. This Court disagrees.

Plaintiffs claim the swing set and the new tree block their view of the lake. During their testimony they rarely, if ever, used the word "obstruct" or "obstruction", instead choosing to use the term 'block" or 'blocks" and never attempted to reconcile the two terms. Plaintiffs have also failed to argue what the developers of the plat intended when they used the phrase "obstruct the lot owners' view of the lake" in the same section that prohibits the placement of structures that could also obstruct the lot owners' view of the lake. They have suggested the Court should not give any special consideration to the clear plural possessive designation of "owners' view of the lake", but somehow recognize a personal or special view of the lake because of the location of the Chrestons' and Moodys' lots.

When a term in a contract or statute is not defined a generally understood definition or meaning is used when applying the term. Dictionary definitions for the word "obstruct" vary depending on the context in which the word is being used. An obstruction of travel or passage is different from an obstruction of progress or an activity, which is again different from an obstruction of view. As this case involves a claimed obstruction of view, the other forms of obstruction are not relevant.

Webster's Dictionary of the English Language Unabridged, Deluxe Edition defines "obstruct" as (a) to get in the way of; to cut off (an object)from view; (b)to block (the view). In this case the object to be viewed is Lake Huron. Not a boat on the lake or some other object on the lake. Subsection (h) of the deed restrictions deals with the right of all lot owners to enjoy an unobstructed view of the lake, a view which is not unique or personalized because of the location of your lot. In order for the meaning of the term to be fairly and consistently applied it cannot be based on the subjective viewpoint of lake facing lot owners to the exclusion of interior lot owners who must walk or drive to enjoy lake views. The term must be objectively applied.

When it comes to the new swing set it cannot reasonably be argued the swing set cuts off or blocks anyone's view of the lake. The full landscape of the lake from North to South can still be seen. Aesthetically, as noted above, the view of the lake is better now than it was before. Plaintiffs argument that the new swing set is an obstruction of their view of the lake is an unreasonably narrow subjective interpretation of the meaning of an obstruction and is not consistent with the developer's intent when subsection (h) is read as a whole and in conjunction with other language promoting a summer resort like atmosphere. The swing set is not an obstruction that blocks the lot owners' view of the lake.

* * *

The Court's analysis and findings regarding the new swing set is also applicable to the new tree. The new tree does not block or cut off "the lot owners' view of the lake." Whether the tree is a replacement tree or a new tree is irrelevant if it does not obstruct the lot owners' view of the lake. This is not to say LHMA should have unfettered discretion to plant as many new trees as it would like because depending on the number of new trees, the location, the type, and the mature size an obstruction issue could exist. If a tree is truly a replacement tree in the same area as a removed dead tree, for example, an obstruction argument becomes moot because of acquiescence to the old tree. A replacement tree cannot be considered a more serious violation, assuming it is a violation at all.

This Court will not engage in any form of speculation about future tree planting projects or an alleged five year plan that was said to be on hold during the testimony at trial. An alleged violation of a deed restriction is a fact driven question to be decided on a case by case basis.

## II. STANDARD OF REVIEW

"Following a bench trial, we review for clear error the trial court's factual findings and review de novo its conclusions of law." *Ligon v Detroit*, 276 Mich App 120, 124; 739 NW2d 900 (2007). Because restrictive covenants are grounded in contract, the interpretation of restrictive covenants presents a question of law that this Court reviews de novo. *Thiel v Goyings*, 504 Mich 484, 495; 939 NW2d 152 (2019). Bylaws adopted by an entity are also contractual in nature, and we thus review the interpretation of bylaws de novo. *Conlin v Upton*, 313 Mich App 243, 254-255; 881 NW2d 511 (2015); *Tuscany Grove Ass'n v Peraino*, 311 Mich App 389, 393; 875 NW2d 234 (2015).

A trial court's decision to grant or deny injunctive relief with respect to the enforcement of a restrictive covenant involves an exercise of the court's equitable powers. See *Webb v Smith*, 224 Mich App 203, 210-211; 568 NW2d 378 (1997). This Court reviews equitable actions de novo, although we review any findings of fact supporting the trial court's decision for clear error. *Id*. at 210; *McFerren v B & B Investment Group*, 253 Mich App 517, 522; 655 NW2d 779 (2002). Likewise, we review a trial court's ultimate decision regarding a declaratory judgment de novo, and we review the trial court's underlying factual findings for clear error. *Fed Home Loan Mtg Corp v Werme*, 335 Mich App 461, 468; 966 NW2d 729 (2021). "A court acting in equity looks at the whole situation and grants or withholds relief as good conscience dictates." *McFerren*, 253 Mich App at 522 (quotation marks and citations omitted). A factual finding is clearly erroneous if "this Court is left with a definite and firm conviction that a mistake has been made." *Fed Home Loan*, 335 Mich App at 468 (quotation marks and citation omitted).

## III. ANALYSIS

On appeal, plaintiffs maintain that the installation of the new swing set and the planting of the new red rocket maple tree constitute violations of the restrictive covenant, and parallel bylaw restriction, at issue. As previously stated, the pertinent restrictive covenant provides:

> Together with the right to use and enjoy in common with other grantees and persons who shall become lot owners in said plat as grantees of the parties of the first part, their heirs and assigns, all land lying between the platted portion of said Lake Huron Manor Plat and the meander line of Lake Huron, which use and enjoyment by said second party and the other grantees and persons shall be limited to such use as is usual for residents and visitors at a family summer resort to make of a beach in connection with such resort. Together with all and singular the hereditaments and appurtenances [thereunto] belonging or in anywise appertaining.

> There is established a general plan of restrictions to apply to all lots numbered from one to one hundred and twenty, both inclusive, only, of said Lake Huron Manor Plat. The lands herein conveyed are part of said Lake Huron Manor Plat and it is understood and agreed that the lands herein conveyed shall be subject to and conditioned upon the following restrictions and reservations:

> \* \* \*

(h) No building, tent, or other structure of any kind or nature (except Community flag pole) whether permanent or temporary shall be erected or maintained on that portion of land lying between the platted lots and the waters of Lake Huron, nor shall any vehicle park thereon, nor shall anything be placed thereon that shall obstruct the lot owners' view of the lake.

Article 11 of defendant's bylaws states in relevant part as follows:

The restrictions imposed by . . . sub-headings of Property Deeds or Land Contracts covering conveyance of Property in the Lake Huron Manor Plat shall be considered an integral part of the By-Laws of the Association. For emphasis, some of the restrictions are herewith quoted:

1. Par. "h" No building, tent, or other structure of any kind or nature (except Community flag pole), whether permanent or temporary shall be erected or maintained on that portion of land lying between the platted lots and the waters of Lake Huron, known as "the Park", nor shall any motor driven vehicle park or drive thereon, nor shall anything be placed thereon that shall obstruct the lot owners' view of the lake.

Exceptions may include but are not limited to family celebrations, graduation parties, weddings, etc. Such special events will require prior approval of the board and will be posted on the calendar on the community bulletin board at the tennis courts and on the Lake Huron Manor Association Facebook page. Responsible parties will be instructed as to appropriate removal and clean-up within 48 hours after the event.

"A deed restriction represents a contract between the buyer and the seller of property." *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 212; 737 NW2d 670 (2007). A covenant that runs with the land "is a contract created with the intention of enhancing the value of property, and, as such, it is a 'valuable property right' " that courts will enforce. *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002) (citation omitted). "If a deed restriction is unambiguous, we will enforce that deed restriction as written unless the restriction contravenes law or public policy, or has been waived by acquiescence to prior violations, because enforcement of such restrictions grants the people of Michigan the freedom 'freely to arrange their affairs' by the formation of contracts to determine the use of land." *Bloomfield Estates*, 479 Mich 206, 214; 737 NW2d 670 (2007) (citation omitted).

"Restrictive covenants in deeds are strictly construed against parties seeking to enforce them," and "[a]ll doubts are resolved in favor of the free use of property." *City of Livonia v Dep't of Social Servs*, 423 Mich 466, 525; 378 NW2d 402 (1985). "Courts review restrictive covenants with a special focus on determining the restrictor's intent." *Thiel*, 504 Mich at 496. Challenges to restrictive covenants are considered "in a contextualized, case-by-case manner." *Id*. "[W]e are not so much concerned with the rules of syntax or the strict letter of the words used as we are in arriving at the intention of the restrictor, if that can be gathered from the entire language of the instrument." *Id*. (quotation marks and citation omitted; alteration in original). Accordingly, the meaning of the language must be determined by "reading the covenants as a whole rather than

from isolated words," construing "the language with reference to the present and prospective use of property," and understanding the chosen language "in its ordinary and generally understood or popular sense" without "technical refinement." *Id.* (quotation marks and citations omitted).

An entity's validly promulgated bylaws similarly "constitute a binding contractual agreement between the entity and its members." *Conlin*, 313 Mich App at 255. We thus interpret bylaws under the same rules applicable to interpreting contracts, examining the actual language of the bylaws, interpreting words according to "their plain and ordinary meaning," and "enforc[ing] clear and unambiguous language as written." *Tuscany Grove Ass'n*, 311 Mich App at 393.

Plaintiffs' appellate argument treats the restrictive covenant and parallel bylaw provision as coextensive, and plaintiffs do not advance any argument that one is somehow more restrictive than the other. Plaintiffs do not argue that the installation of the swing set or planting of the tree could somehow violate one without also violating the other. Accordingly, we treat them as coextensive for purposes of this appeal such that there is no need to separately analyze the restrictive covenant and bylaw provision in this case.

Plaintiffs argue that the trial court failed to enforce the restriction as written. With respect to the swing set, plaintiffs argue that they did not acquiesce to the installation of a *new* swing set after the old swing sets and play structure were removed, and plaintiffs additionally argue that the trial court erred by finding that the new swing set was a *de minimus* obstruction. Plaintiffs maintain that the new swing set was "bigger, wider, and taller than the small swing sets that had been removed" and that the new swing set was a more serious violation of the restrictive covenant.

As previously stated, although unambiguous restrictive covenants will be enforced, an exception exists when the restriction "has been waived by acquiescence to prior violations." *Bloomfield Estates*, 479 Mich at 214. "[W]hether or not there has been a waiver of a restrictive covenant or whether those seeking to enforce the same are guilty of laches are questions to be determined on the facts of each case as presented." *Id.* at 218 (quotation marks and citation omitted). Nonetheless, "if a plaintiff has not challenged previous violations of a deed restriction, the restriction does not thereby become void and unenforceable when a violation of a *more serious and damaging degree occurs*." *Id.* at 219 (quotation marks and citation omitted). As our Supreme Court has explained:

> When determining whether prior acquiescence to a violation of a deed restriction prevents a plaintiff from contesting the current violation, we compare the character of the prior violation and the present violation. Only if the present violation constitutes a "more serious" violation of the deed restriction may a plaintiff contest the violation despite the plaintiff's acquiescence to prior violations of a less serious character. In general, a "more serious" violation occurs when a particular use of property constitutes a more substantial departure from what is contemplated or allowable under a deed when compared to a previous violation. . . . That is, use that constitutes a "more serious" violation imposes a greater burden on the holder of a deed restriction than the burden imposed by a previous violation. Although determining whether a "more serious" violation occurred will hinge on the facts of a particular case, some relevant factors that may be considered include: (1) whether the later violation involved the erection of a structure where no such structure had

previously been permitted; (2) whether the later violation constituted a more extensive violation of restrictions on the size or extent of a building; (3) whether the later violation increased the use of land from a sporadic violation of the restriction to a continuous violation; (4) whether the later violation significantly increased the noise or pollutant level on restricted land; (5) whether the later violation increased the level of traffic occasioned by the prior violation; (6) whether the later violation permitted an action that had been previously prohibited; and (7) whether the later violation altered in some material respect the character of the use of the restricted property. [*Id*. at 219-220 (citations omitted).]

Here, there was no dispute that swing sets and other playground equipment had been in the park for decades. Testimony at trial, which was supported by photographs, showed that the Park previously had two other swing sets and a playscape with swings and a slide. The record further reflects that the new swing set was installed in the same general area on the north side of the park where a swing set and the playscape had been located. The new swing set was installed within weeks of removing the two pieces of equipment on the north side of the Park. Plaintiffs do not claim to have challenged the existence of the old swing sets. Moreover, plaintiffs conceded at trial that they acquiesced to the old swing sets and that if the new swing set did not constitute a more serious violation of the restrictive covenant, then they were not entitled to relief regarding the swing set.

Comparing the character of the old swing sets to the new swing set, see *id*., the record reflects that the new swing set replaced two pieces of similar equipment in the same general location. Although there was testimony and photographic evidence suggesting that the new swing set was larger than each of the two older swing sets, the replacement resulted in fewer total swings in that location, and there was still one slide as there had been previously. The new swing set also occupied a smaller area of the Park than the previous two pieces of equipment in that area combined. The frame of the new swing set is a simple structure of metal poles, leaving more empty space through which to view Lake Huron than the old playscape made of thick wood that also included a partially "fenced in" structure at the top of the slide. Thus, the new swing set (1) did not constitute the erection of a structure that had not previously been permitted, (2) was a *less* extensive violation of the restriction prohibiting structures in the Park, (3) did not create an increase of a prohibited use, (4) did not increase noise or pollution, (5) did not increase traffic, (6) did not permit an action that had previously been prohibited, and (7) did not materially alter the character of the Park. *Id*.

Accordingly, the trial court did not clearly err by finding that the new swing set did not constitute a more serious violation than the past violations to which plaintiffs and other lot owners had admittedly acquiesced for many years. *Id*. Therefore, plaintiffs waived any claim that installation of the new swing set violated the deed restriction prohibition related to structures. *Id*. at 214.

Plaintiffs also appear to misunderstand the trial court's use of the term "*de minimus*" in its ruling. It is true that "the plaintiff's right to maintain the restrictions is not affected by the extent of the damages he might suffer for their violation" because "a breach of a covenant, no matter how minor and no matter how *de minimis* the damages, can be the subject of enforcement" by injunction. *Terrien*, 467 Mich at 65 (quotation marks and citation omitted). In this case, however,

the trial court used the term *de minimus* in the context of determining that the new swing set did not constitute a more serious violation of the restrictive covenant than the old swing sets to which plaintiffs admittedly acquiesced and that plaintiffs could not enforce the restrictive covenant with respect to the swing set because such enforcement had been waived by acquiescence, as explained above. The trial court did not deny plaintiffs relief based on a finding that the swing set did not cause substantial damage to plaintiffs' property rights. Plaintiffs' argument regarding the trial court's use of the term "*de minimus*" is therefore misplaced and does not demonstrate that the trial court's ruling was contrary to the rule expressed in *Terrien*, 467 Mich at 65.

Next, plaintiffs argue that the trial court's construction of the term "obstruct" was too "restrictive" by—according to plaintiffs—defining the term to mean "a total opaque blocking." Plaintiffs essentially maintain that any structure that is placed within any of plaintiffs' individual views of Lake Huron blocks, hinders, or impedes their views such that it constitutes an obstruction and is thus prohibited by the restrictive covenant at issue. This argument refers to the last clause of the restrictive covenant, which provides: "nor shall anything be placed thereon that shall obstruct the lot owners' view of the lake." Further, plaintiffs assert that the restrictive covenant is intended to protect their individual, unique views from their respective residences.

Plaintiffs ignore the express use of the plural possessive in the deed restriction language prohibiting the placement of anything on the Park "that shall obstruct the lot *owners'* view of the lake." (Emphasis added.) This choice of language indicates that plaintiffs cannot simply acquiesce to obstructing the views of other lot owners while simultaneously protecting their own personal, subjective and unique views from any slight impairment or partial obstruction.

Rather, it is evident from the language of the restriction, especially when considered along with the additional language granting the use of the Park to the lot owners in common, that the view to be protected is the objective, general view of the lake by the lot owners collectively within the subdivision, without reference to the view from any particular position, whether that position involves standing in a particular place in the Park or the view from a particular lot or residence. There is nothing in the language of the restriction granting such protection for unique, subjective, individual views. "When construing a restrictive covenant, courts may only give it a fair construction; courts may not broaden or limit the restriction. To that end, courts will not infer the existence of a restriction—the restriction must be expressly provided in the controlling documents." *Conlin*, 313 Mich App at 256 (citation omitted). "Courts sitting in equity do not aid one man to restrict another in the use to which he may put his property unless the right to such aid is clear." *Id*. (quotation marks and citation omitted).

With respect to the new tree that was planted in 2019, a tree is not a structure and plaintiffs apparently rely on the last clause of the deed restriction prohibiting the placement of "anything . . . thereon that shall obstruct the lot owners' view of the lake" as grounds for arguing that planting the new tree violated the covenant.

However, despite this language, the testimony at trial established that there had been many trees within the Park for decades. There was no evidence that plaintiffs ever objected to the

existing trees remaining in the Park.[5]  Accordingly, the question becomes whether plaintiffs waived the restrictive covenant by acquiescence to a view of the lake that included within it approximately 15 to 20 trees in the Park. *Bloomfield Estates*, 479 Mich at 214, 218.  The record evidence indicates that before the new tree was planted, the view of Lake Huron across the Park included multiple trees within that view through which the lake was also clearly visible.  Thus, for decades, this view has not been completely unobstructed but has instead been a view of the lake that was partially obstructed by trees.  Alternatively, it could be considered a view of "water and trees" rather than a view of only the lake.  A single additional tree, especially in light of the evidence that some trees had been lost in the Park over the years, does not materially alter the character of the Park or the view of Lake Huron, and it is not a more serious violation of the restrictive covenant. *Id*. at 219-220.[6]  As a consequence, plaintiffs' objection has been waived by acquiescence, *id*., and the trial court did not err by denying plaintiffs relief with respect to the red rocket maple tree.  Moreover, as previously discussed, the restrictive covenant did not grant individual lot owners protection over an individual, unique, subjective view at the expense of other lot owners.  Thus, to the extent plaintiffs claim that the placement of the new tree somehow obstructs their own personal views only, this argument is unavailing.  The trial court did not err by denying plaintiffs relief with respect to the tree.

Affirmed. Defendants having prevailed may tax costs.  MCR 7.219.

/s/ Michael J. Riordan
/s/ Stephen L. Borrello
/s/ Anica Letica

---

[5] Although Holly objected to the planting of a new tree in 2013, she had owned her property since 2004 and had never objected to the many pre-existing, established trees in the Park.  Hence, this does not change our conclusion that she acquiesced to a view of the lake that included trees within the view.

[6] The other factors are generally not applicable to this question involving the tree.  To the extent they could be applicable, none would weigh in favor of finding that the new tree was a more serious violation.

-12-